CASE 50.—ACTION BY ELIJAH HUGHES AND OTHERS
AGAINST H. J. WALLACE AND OTHERS, INVOLV-
ING THE RIGHT OF THE CUMBERLAND PRESBY-
TERIAN CHURCH TO UNITE WITH THE PRESBY-
TERIAN CHURCH IN THE UNITED STATES OF
AMERICA.—January 21, 1909.

# Wallace, &c., v, Hughes, &c.

Appeal from Union Circuit Court.

J. W. HENSON, Circuit Judge.

Judgment for plaintiffs.   Defendants appeal.—Re-
versed.

1.  Religious Societies—Property—Conflicting Claims—Determina-
    tion byCivil Courts.—Where a donor has dedicated property
    to advance or disseminate a particular religious doctrine or
    faith, and conflicting claims arise as to its ownership or
    possession, the civil courts will determine which of the rival
    claimants is holding to the faith the donor desired to favor,
    and award the property to him.
2.  Same — Congregational   Government — Property — Dispute. —
    Where no specific religious trust is impressed on property
    belonging to a church having a congregational form of gov--
    ernment, and a schism arises, together with a dispute as to
    the property, the courts will generally award it to that faction
    which constitutes the majority of the original congregation.
3.  Same—Property—Right to Hold.—When a Presbyterian con-
    gregation, controlled by an ecclesiastical form of government
    of the Presbyterian type, acquired property for religious wor-
    ship, not charged with any specific religious trust, it was
    entitled to hold and enjoy the property only so long as the
    congregation could be identified as an integral part of the
    general ecclesiastical government.
4.  Same—Constitution and Laws—Judicatories—Judicial Power.
    —Since religious organizations are mere voluntary associa-
    tions, whose constitutions and laws, so far as civil tribunals
    are concerned, are in the nature of ·contracts between the

members, where a schism occurs in a Presbyterian congregation under an ecclesiastical form of government of the Presbyterian type, the civil tribunals will award the property in accordance with the decision of the ecclesiastical court determining the question as to which faction is identified as an integral part of the general ecclesiastical government.

5. Same—Constitution—Limitation of Power.—Cumberland Presbyterian Constitution, section 25, after defining the jurisdiction of various courts, declared that such jurisdiction was limited by the express provisions of the constitution. Section 43 provided that the General Assembly should have power to receive and decide all appeals, to hear testimony against error in doctrine and immorality in practice injuriously affecting the church, to decide all controversies respecting doctrine and discipline, to authorize synods and presbyteries, and exercise similar power in receiving bodies suited to become constituents of the courts, and to superintend the affairs of the whole church. Confession of Faith, sections 110, 111, also provided for the existence of church courts and their jurisdiction. Held, that the constitution should be treated as a limitation, and not a grant of power and hence the various church judicatories had all the ecclesiastical powers of the church, except as limited by the express provisions of the constitution.

6. Same — Constitution — Construction — Union with Other Churches.—Cumberland Presbyterian Constitution, section 43, providing that the General Assembly should have power to receive under its jurisdiction other ecclesiastical associations whose organization conformed to the doctrine and order of the church, and to authorize synods and presbyteries to exercise similar power in receiving bodies suitable to become constituents of those courts, authorized the General Assembly of the church to unite the entire church with the Presbyterian Church of the United States, from which the Cumberland had separated.

7. Same—Union—Similarity of Faith—Determination.—Under Cumberland Presbyterian Constitution, section 43, authorizing the General Assembly to receive under its jurisdiction other ecclesiastical bodies conforming to the doctrine and order of the church, whether the confession of faith of another association to be received does conform to the Cumberland Presbyterian confession, was a question of doctrine, faith, and church government, the decision of which by the General Assembly was conclusive on the courts.

8. Same—Confession of Faith—Change.—Cumberland Presby-

terian Constitution, section 60, providing that on the recommendation of the General Assembly, at a stated meeting, by a two-thirds vote, the confession of faith or constitution of the church may be amended or changed when a majority of the presbyteries approve, confers on the General Assembly plenary power to change the name of the church, to adopt an entirely new confession of faith, and to change or modify the constitution by a two-thirds vote of its members, approved by a majority of the presbyteries.

9.  Same—Constitution—Amendment.—Cumberland Presbyterian Constitution, section 60, authorizes the General Assembly, at a stated meeting, by a two-thirds vote, to change the confession of faith or constitution of the church, when approved by a majority of the presbyteries. Held that, since the church was not congregational in its form of government, the adoption of a plan of union with the Presbyterian Church of the United States, by the General Assembly, approved by a majority of the presbyteries, constituted in effect an amendment of the constitution and confession of faith, and was valid, without the consent and against the protest of the Cumberland congregation.

10.  Same—Church Property—Rights of Members.—Where the members of a church do not choose to follow the decrees of their church judicatories within their jurisdiction, they abandon all interest in its property.

JOHN M. GAUNT, HUMPHREY & HUMPHREY, J. MACK THOMPSON, H. Y. MORTON for appellants.

## SUMMARY.

We confess not to be able to understand the refinement of construction which admits that the Cumberland Presbyterian Assembly had the right to admit other ecclesiastical organizations into union with it and yet had no right to allow a union between the Cumberland Presbyterian Church and another ecclesiastical organization. This it seems to us is very much like saying that it is lawful for a man to marry but it is not lawful for anybody to marry him. Furthermore, it would seem to us to be a strange contention to make before a court which has determined that such an ecclesiastical organization as the Methodist-Episcopal Church had the inherent right to divide and yet that such an organization as the Cumberland Presbyterian Church had not the right to unite.

As we understand the argument on the other side this union

would have been perfectly regular provided the uniting body had taken the name of the Cumberland Presbyterian Church and the other ecclesiastical organization uniting had been composed of a smaller number of churches and members than the Cumberland Presbyterian Church.

We submit that the opinion of Chief Justice Cobb, in the Georgia case, is exactly in line with the Kentucky authorities, and that there is not a word in its opinion which is not supported by adjudications in this state.

We respectfully submit, therefore, that the judgment should be reversed and that those persons adhering to the union should be adjudged as the true Cumberland Presbyterian Church of Sturgis, and therefore entitled to control and manage the church property.

W. C. CALDWELL, GEO. S. WILSON and P. B. MILLER for appellees.

## POINTS AND AUTHORITIES.

1. Religious trusts, how created and how lost—Courts of equity protect. (Smith v. Pedigo, 145 Ind. 361, 32 L. R. A. 839, 846; Mt. Zion Bapist Church v. Whittmore, 83 Iowa 147, 13 L. R. A. 198; Park v. Champlin, 86 Iowa 55, 31 L. R. A. 141, 144; Hale v. Everett, 63 N. H. 9, 16 Am. Rep. 82, Schnorr's Appeal, 67 Penn. St. 138, 5 Am. Rep. 415; Finley v. Brent, 87 Va. 103, 11 L. R. A. 214; Nance v. Busby, 91 Tenn. 305; Bridges v. Wilson, 11 Heis., 458 Mount Helm Baptist Church v. Jones, 79 Miss. 488, 30 So. 714; Dr. Dabney's Discussion, vol. 2, p. 288; Godfrey v. Walker, 42 Ga. 562; Deadrick v. Lampton, 11 Heis. 523; Bridges v. Wilson, 11 Heis. 459; McKinney v. Griggs, 5 Bush 401, 9 Am. D. 361; Newman v. Proctor, 10 Bush 318; Brown v. Mason, 80 Ky. 443; Finley v. Brent, 97 Va. 103, 11 L. R. A. 214; also numerous cases cited in Hale v. Everett (N. H.) 16 Am. Rep. 114, and in note on p. 509 of Am. and Eng. Dec. in Equity; McKinney v. Griggs, 5 Bush 401; Newman v. Proctor, 10 Bush 318; Brown v. Harper, 80 Ky. 443, 87 Va. 103.

2. Whole movement unconstitutional. (Watson v. Avery, 2 Bush 332, 339; Bear v. Heasley, 98 Mich. 279, 24 L. R. A. 623; Bunn v. Gorgas, 41 Pa. 446; Krecker v. Shirey, 163 Pa. 634, 29 L. R. A. 481; Gartin v. Penick, 5 Bush 110; Herr's Appeal, 89 Pa. 97; Deaderick v. Lampson, 11 Heis. 523; Watson v. Avery, 2 Bush 333; Gartin v. Penick, 5 Bush 110.)

3. Majority exceeded their commission. (Free Church of Scotland v. Lord Overton, Law Reports, Appeal Cases, p. 687.)

4. Ecclesiastical decisions not conclusive when civil rights are involved.

5. Civil courts decide civil rights for themselves. (Watson v. Avery, 2 Bush 332; Nance v. Busby, 91 Tenn. 304; Associate Reform Chuch v. Trustees Theological Seminary, 4 N. J. ch. R. (3 Green) 77; Gartin v. Penick, 5 Bush 110.)

OPINION OF THE COURT BY JUDGE BARKER—Reversing.

The appellees, who were plaintiffs below, instituted this action to recover possession of a lot of land situated in Sturgis, Ky., from the appellants, who were defendants below, and who, it was alleged in the petition, were wrongfully withholding the property from the plaintiffs. Directly the action involves the title to, and the right to possess, the real estate described in the petition. Incidently there is involved the right of the ecclesiastical organization known as the Cumberland Presbyterian Church to unite with the Presbyterian Church in the United States of America.

The plaintiffs, in their petiiton, describe themselves as elders, members, and communicants of the local congregation of Cumberland Presbyterians worshipping at Sturgis, Ky., and the property, which is the subject of the litigation, is a church house and the lot upon which it stands at that place. The lot was conveyed on the 6th day of August, 1889, by the Cumberland Iron & Coal Company, to eight named trustees, who are described as composing the session and board of trustees of the Cumberland Presbyterian Church, of Sturgis, Ky., and the habendum of the deed provided that they were to have and to hold the property, with all the appurtenances thereto belonging, unto them and to their successors, forever. The appellants (defendants) answered, controverting the

title and right of possession of appellees to the property sued for, and alleging title and right of possession thereto in themselves as trustees of the Presbyterian Church at Sturgis, the lawful successor to the Cumberland Presbyterian Church at that place, since the reunion of the Cumberland Presbyterian Church with the Presbyterian Church in the United States of America.

It will materially lessen our labors to say now that the pleadings in this case, which are long and complicated, present one material issue—i. e., the constitutional right of the general assembly of the Cumberland Presbyterian Church to unite with the Presbyterian Church in the United States of America. If it had such right, in our opinion the property involved in this litigation belongs to the appellants. If this constitutional power was lacking, the judgment of the circuit court, awarding it to appellees, was correct.

The Cumberland Presbyterian Church originated in a schism in the Presbyterian Church in the United States of America in 1810, and was caused by certain differences of opinion which had arisen theretofore concerning the doctrine of foreordination, predestination, and election. A history of the occurrence is contained in the preface to the Confession of Faith officially promulgated by the Cumberland Presbyterian church, and is as follows:

"The Cumberland Presbyterian Church was organized in Dickson county, Tennessee, February 4, A. D. 1810. It was an outgrowth of the great revival of 1800—one of the most powerful revivals that this country has ever witnessed. The founders of the church were Finis Ewing, Samuel King and Samuel McAdow. They were ministers in the Presbyterian

Church, who rejected the doctrine of election and reprobation as taught in the Westminster Confession of Faith. The causes which led to the formation of the church are clearly and distinctly set forth in publications issued at the time, and in various tracts and books published subsequently. To these the reader is referred for full information on the subject. The Cumberland Presbytery, which was constituted at the time of the organization of the church, and which originally consisted of only three ministers, was in three years sufficiently large to form three presbyteries. These presbyteries, in October, A. D. 1813, met at the Beech church, in Sumner county, Tennessee, and constituted a synod. This synod at once formulated and published a 'Brief Statement,' setting forth the points wherein Cumberland Presbyterians dissented from the Westminster Confession of Faith. They were as follows: (1) That there are no eternal reprobates. (2) That Christ died, not for a part only, but for all mankind. That all infants dying in infancy are saved through Christ and the sanctification of the Spirit. That the Spirit of God operates on the world, or as coextensively as Christ has made atonement, in such a manner as to leave all men inexcusable.

"At this same meeting of synod, too, a committee was appointed to prepare a Confession of Faith. The next year, A. D. 1814, at Sugg's Creek church, Wilson county, Tennessee, the report of the committee was presented to synod and the revision of the Westminster Confession of Faith which they presented was unanimously adopted as the Confession of Faith of the Cumberland Presbyterian Church. Subsequently the formation of the General Assembly took place. This judicature, at its first meeting, A. D.

1829, at Princeton, Ky., made such changes in the form of government as were demanded by the formation of this new court. In compiling the Confession of Faith, the fathers of the Cumberland Presbyterian Church had one leading thought before them, and that was to so modify the Westminster confession as to eliminate therefrom the doctrine of universal foreordination and its legitimate sequences, unconditional election and reprobation, limited atonement, and divine influence correspondingly circumscribed. All the boldly defined statements of the doctrine objected to were expunged, and corrected statements were made. But it was impossible to eliminate all the features of hyper-Calvinism from the Westminster Confession of Faith by simply expunging words, phrases, sentences, or even sections, and then attempting to fill the vacancies thus made by corrected statements or other declarations, for the objectionable doctrine, with its logical sequences, pervaded the whole system of theology formulated in that book.''

It will thus be seen that the organization of the Cumberland Presbyterian Church originated in differences of opinion which arose concerning certain doctrinal tenets of the Presbyterian Church. The new church grew and prospered, until, at the time it reunited with the mother church, in 1906, it claimed nearly 200,000 communicants, who were scattered throughout the various States of the Union. From the very beginning of its existence, as we shall hereafter more fully show, the new church earnestly desired a reunion with the mother church whenever this could be accomplished on a basis which it could conscientiously accept. This spirit was expressed in circular letters, resolutions of the general assembly, the appointment of committees on fraternity and union,

and the negotiations for reunion with the mother church and union with other churches whose doctrines nearly approached those held by the new church.

In 1903 the Presbyterian Church in the United States of America revised its creed, by which it undertook to eliminate therefrom whatever constituted the basis for the belief that it taught the doctrine of fatalism as applied to the salvation of men. Thereafter, but in the same year, the General Assemblies of the Presbyterian Church of the United States and the Cumberland Presbyterian Church appointed a joint committee on fraternity and union, which set on foot a movement that culminated in a reunion of the two churches. This joint committee, as a basis of the proposed reunion, agreed upon a plan which was expressed in the form of a resolution to be adopted by the General Assemblies of the respective churches, and to be approved in a lawful way by a majority of the Presbyteries of the two organizations. We do not think that it is necessary to set forth in detail the various steps which were taken in regard to the proposed plan of reunion—it being deemed sufficient to say that, in our opinion, these steps were regularly and properly taken; that the plan, in so far as it could be lawfully done, was adopted; that the union, in so far as the Cumberland Presbyterian Church had power to establish it, was accomplished by the adoption of the plan formulated by the joint committee. We think, however, it is proper, in order to a more enlightened and comprehensive view of the union which took place, to set forth in full the plan formulated by the joint committee on fraternity and union, and which, as said before, constitutes the basis of the reunion of the two churches, together with the official declaration

of the Presbyterian Church revising the Westminster Confession of Faith, which constituted the condition precedent to the reunion, and also such parts of the confession of Faith of the Cumberland Presbyterian Church and of its constitution as seem to bear upon the right of that body to reunite with the mother church.   They are as follows:

"Plan of Reunion and Union of the two Churches.

"We believe that the union of Christian churches of substantially similar faith and policy would be to the glory of God, the good of mankind, and the strengthening of Christian testimony at home and abroad.

"We believe that the manifest providential developments and leadings in the two churches since their separation, together with present conditions of agreement and fellowship, have been and are such as to justify their reunion.

"Therefore we cordially recommend to your respective General Assemblies that the reunion of the Presbyterian Church in the United States of America and the Cumberland Presbyterian Church be accomplished, as soon as the necessary steps can be taken, upon the basis hereinafter set forth.

"The Presbyterian Church in the United States of America, whose General Assembly met in the Immanuel Church, Los Angeles, Cal., May 21, 1903, and the Cumberland Presbyterian Church, whose General Assembly met in the First Cumberland Presbyterian Church, Nashville, Tenn., May 21, 1903, shall be united as one church, under the name and style of the Presbyterian Church in the United States of America,' possessing all the legal and corporate

rights and powers which the separate churches now possess.

"(2) The union shall be effected on the doctrinal basis of the Confession of Faith of the Presbyterian Church in the United States of America, as revised in 1903, and of its other doctrinal and ecclesiastical standards, and the Scriptures of the Old and New Testaments shall be acknowledged as the inspired Word of God, the only infallible rule of faith and practice.

"(3) Each of the Assemblies shall submit the foregoing Basis of Union to its presbyteries, which shall be required to meet on or before April 30, 1905, to express their approval or disapproval of the same by a categorical answer to this question: 'Do you approve of the reunion and union of the Presbyterian Church in the United States of America and the Cumberland Presbyterian Church on the following basis: The union shall be effected on the doctrinal basis of the Confession of Faith of the Presbyterian Church in the United States of America, as revised in 1903, and of its other doctrinal and ecclesiastical standards, and the Scriptures of the Old and New Testaments shall be acknowledged as the inspired Word of God, the only infallible rule of faith and practice?'

"Each presbytery shall, before the 10th of May, 1905, forward to the stated clerk of the Assembly with which it is connected a statement of its vote on the said Basis of Union. The report of the vote of the presbyteries shall be submitted by the respective stated clerks to the General Assemblies meeting in 1905, and if the General Assemblies shall then find and declare that the foregoing Basis of Union has been approved by the constitutional majority of the

presbyteries connected with each branch of the church, then the same shall be of binding force, and both Assemblies shall take action accordingly.

## "Concurrent Declarations.

"As there are matters pertaining to the interests. of the church which will manifestly require adjustment when the reunion shall have been accomplished, and concerning which it is highly desirable that there shall be a previous good understanding, the two Assemblies agree to adopt the following concurrent declarations as in their judgment proper and equitable arrangements and agreements:

"(1) In adopting the Confession of Faith of the Presbyterian Church in the United States of America, as revised in 1903, as a Basis of Union, it is mutually recognized that such agreement now exists between the system of doctrine contained in the Confession of Faith of the two churches as to warrant this union—. a union honoring alike to both. Mutual acknowledgment also is made of the teaching and defense of essential evangelical doctrine held in common by these churches, and of the divine favor and blessing that have made this common faith and service effectual. It is also recognized that liberty of belief exists by virtue of the provisions of the Declaratory Statement, which is part of the Confession of Faith of the Presbyterian Church in the United States of America, and which states that "the ordination vow of ministers, ruling elders, and deacons, as set forth in the Form of Government, requires the reception and adoption of the Confession of Faith only as containing the system of doctrine taught in the Holy Scriptures.' This liberty is specifically secured by

the Declaratory Statement, as to chapter III and chapter X, section 3, of the Confession of Faith. It is recognized, also, that the doctrinal deliverance contained in the Brief Statement of the Reformed Faith, adopted in 1903, by the General Assembly of the Presbyterian Church in the United States of America, 'for a better understanding of our doctrinal beliefs,' reveals a doctrinal agreement favorable to reunion.

"(2) All the ministers and churches included in the two denominations shall be admitted to the same standing in the United Church which they may have held in their respective connections up to the con- summation of the reunion.

"(3) The boundaries of the several presbyteries and synods shall be adjusted by the General Assembly of the United Church.

"(4) The official records of the two churches during the period of separation shall be preserved and held as making up the history of the one church.

"(5) As soon as practicable after the union shall have been effected, the General Assembly shall reconstruct and consolidate the several permanent committees and boards, which now belong to the two Assemblies, so as to represent, with impartiality, the views and wishes of the two bodies constituting the reunited church.

"(6) The institutions of learning, together with the endowment and other property, real and personal, owned by them, which are now under the control of the Cumberland Presbyterian Church, shall remain in charge of and be controlled by the boards of trustees, or other managers, respectively, now in charge of such institutions, endowment, and property, or by their successors similarly appointed or

elected, and no greater control of such institutions, their property or affairs, shall be exercised by the General Assembly, or other ecclesiastical court or body, of the reunited church, than is now exercised by the General Assembly, or other ecclesiastical court or body, of the Cumberland Presbyterian Church: Provided, that the governing board of any of said institutions of learning shall be at liberty to enter into such special arrangement or agreement with the ecclesiastical body controlling it as may enable said institution to preserve its integrity and maintain its present policy; and also provided, that nothing in this declaration shall affect the relationship or control of any of the institutions of learning now connected with the General Assembly, or other ecclesiastical court or body, of the Presbyterian Church in the United States.

"(7) The corporate rights now held by the two General Assemblies, and by their boards and committees, shall be consolidated and applied for their several objects as defined and permitted by law.

"(8) It should be regarded as the duty of all our judicatories, ministers, and people to study the things which make for peace, to guard against all needless and offensive references to the causes which have divided us, and to avoid the revival of past issues."

"Recommendations.

"(1) It is recommended that such a change be made in the Form of Government of the Presbyterian Church in the United States of America as will show additional or separate presbyteries and synods to be organized in exceptional cases, wholly or in part within the territorial bounds of existing presbyteries

or synods, respectively, for a particular race or nationality, if desired by such race or nationality.

"(2) The foregoing Basis of Union and eight Concurrent Declarations shall be submitted to the respective General Assemblies of 1904, and the above Recommendation No. 1 shall be submitted to the General Assembly of the Presbyterian Church in the United States of America meeting in 1904; and this entire plan of union shall be operative when said Basis of Union, Concurrent Declarations, and Recommendation No. 1 shall have been adopted in their entirety, and where necessary by presbyterial action.

"(3) That the blessing of the great Head of the Church may rest upon the results of our efforts for reunion and union, it is earnestly recommended to the congregations throughout both branches of the church that they observe Sabbath, September 18, 1904, as a day of fervent and united prayer to Almigthy God that He would grant unto us all "the spirit of counsel and of the fear of the Lord,' and in the new relation now contemplated enable us to keep 'the unity of the spirit in the bond of peace.'

| "W. H. Black. | B. G. Mitchell. |
| "R. M. Tinnon. | W. H. Roberts. |
| "Ira Landrith. | Chas. A. Dickey. |
| "E. E. Beard. | Robert F. Coyle. |
| "S. M. Templeton. | Reuben H. Hartley. |
| "M. B. Templeton. | Douglas G. Putnam. |
| "B. P. Fullerton. | Reuben Tyler. |
| "W. E. Settle. | E. S. Wells. |
| "D. E. Bushnell. | Wm. N. Page. |
| "A. E. Turner. | Wilton M. Smith. |
| "W. J. Darby. | |

"(4) In conclusion, we unite heartily and prayerfully in the recommendation that the 'Joint Report

on Union' be adopted and its provisions carried out with an eye single to the glory of God.

"Fraternally and obediently submitted.

"Wm. H. Black, Ch'm.
"James M. Hubbert, Sec."

"Confession of Faith.

"Sec. 87. Civil officers may not assume to themselves the administration of the world and the sacraments, or in the least interfere in matters of faith; yet it is their duty to protect the church of our common Lord, without giving preference to any denomination of Christians. And, as Jesus Christ has appointed a government and discipline in His church, no law of any Commonwealth should interfere therewith, but should provide that all religions and ecclesiastical assemblies shall be held without molestation or disturbance."

"Sec. 108. The Lord Jesus, as king and head of His church, has therein appointed a government intrusted to church officers, distinct from the civil government.

"Sec. 109. By divine appointment the officers of the visible church have the power to admit members into its communion, to admonish, suspend, or expel the disorderly, and to restore those who, in the judgment of charity, have repented of their sins.

"Sec. 110. Church government implies the existence of church courts, invested with legislative, judicial, and executive authority; and the Scriptures recognize such institutions, some of subordinate and some of superior authority, each having its own particular sphere of duties and privileges in reference to

matters ministerial and ecclesiastical, yet all subordinate to the same general design.

"Sec. 111. It is the prerogative of these courts ministerially to determine controversies of faith and questions of morals, to set down rules and directions for the better ordering of the public worship of God and government of His church, to receive complaints in cases of maladministration, and authoritatively to determine the same, which determinations are to be received with reverence and submission."

"Constitution."

"Sec. 24. It is necessary that the government of the church be exercised under some certain and definite form, and by various courts, in regular gradation. These courts are denominated church sessions, presbyteries, synods, and the General Assembly.

"Sec. 25. The church session exercises jurisdiction over a single church; the presbytery, over what is common to the ministers, church sessions, and churches within a prescribed district; the synod, over what belongs in common to three or more presbyteries, and their ministers, church sessions, and churches; and the General Assembly, over such matters as concern the whole church; and the jurisdiction of these courts is limited by the express provisions of the constitution. Every court has the right to resolve questions of doctrine and discipline seriously and reasonably proposed, and in general to maintain truth and righteousness, condemning erroneous opinions and practices which tend to the injury of the peace, purity, or progress of the church; and, although each court exercises exclusive original

jurisdiction over all matters specially belonging to it, the lower courts are subject to the review and control of the higher courts, in regular gradation. * * *,,

"Sec. 40. The General Assembly is the highest court of this church, and represents in one body all the particular churches thereof. It bears the title of the General Assembly of the Cumberland Presbyterian Church, and constitutes the bond of union, peace, correspondence, and mutual confidence among all its churches and courts."

"Sec. 43. The General Assembly shall have power to receive and decide all appeals, references, and complaints regularly brought before it from the inferior courts; to bear testimony against error in doctrine and immorality in practice, injuriously affecting the church; to decide in all controversies respecting doctrine and discipline; to give advice and instruction, in conformity with the government of the church, in all cases submitted to it; to review the records of the synods; to take care that the inferior courts observe the government of the church; to redress whatever they may have done contrary to order; to concert measures for promoting the prosperity and enlargement of the church; to create, divide, or dissolve synods; to institute and superintend the agencies necessary in the general work of the church; to appoint ministers to such labors as fall under its jurisdiction; to suppress schismatical contentions and disputations, according to the rules provided therefor; to receive under its jurisdiction other ecclesiastical bodies whose organization is conformed to the doctrine and order of this church; to authorize synods and presbyteries to exercise similar power in receiving bodies suited to become constituents of those

courts, and lying within their geographical bounds respectively; to superintend the affairs of the whole church; to correspond with other churches; and, in general, to recommend measures for the promotion of charity, truth, and holiness throughout all the churches under its care.''

''Sec. 60. Upon the recommendation of the General Assembly, at a stated meeting, by a two-thirds vote of the members thereof voting thereon, the Confession of Faith, Catechism, constitution, and rules of discipline, may be amended or changed when a majority of the presbyteries, upon the same being transmitted for their action, shall approve thereof. The other parts of the government—that is to say, the general regulations, the directory for worship, and the rules of order—may be amended or changed at any meeting of the General Assembly by a vote of two-thirds of the entire number of commissioners enrolled at that meeting, provided such amendment or change shall not conflict, in letter or spirit, with the Confession of Faith, Catechism, or constitution.''

''The Declaratory Statement.

''While the ordination vow of ministers, ruling elders, and deacons, as set forth in the Form of Government, requires the reception and adoption of the Confession of Faith only as containing the system of doctrine taught in the Holy Scriptures, nevertheless, seeing that the desire has been formally expressed for a disavowal by the church of certain inferences drawn from statements in the Confession of Faith, and also for a declaration of certain aspects of revealed truth which appear at the present time to call for more explicit statement, therefore the

Presbyterian Church in the United States of America does authoritatively declare as follows:

"First. With references to chapter III of the Confession of Faith, that concerning those who are saved in Christ, the doctrine of God's eternal decree is held in harmony with the doctrine of His love to all mankind. His gift of His Son to be the propitiation for the sins of the whole world, and His readiness to bestow His saving grace on all who seek it; that concerning those who perish, the doctrine of God's eternal decree is held in harmony with the doctrine that God desires not the death of any sinner, but has provided in Christ a salvation sufficient for all, adapted to all, and freely offered in the Gospel to all; that men are fully responsible for their treatment of God's gracious offer; that His decree hinders no man from accepting that offer; and that no man is condemned except on the ground of his sin.

"Second. With reference to chapter X, section 3, of the Confession of Faith, that it is not to be regarded as teaching that any who die in infancy are lost. We believe that all dying in infancy are included in the election of grace, and are regenerated and saved by Christ through the Spirit, who works when and where and how He pleases."

"The New Chapters.

"(Added to the Westminster Confession of Faith, in 1903, as a Part of the Revision.)

"Premable.

"Whereas, it is desirable to express more fully the doctrine of the church concerning the Holy Spirit,

missions, and the love of God for all men, the following chapters are added to the Confession of Faith:

"Chapter xxxiv.—Of the Holy Spirit.

"I. The Holy Spirit, the third person in the Trinity, proceeding from the Father and the Son, of the same substance and equal in power and glory, is, together with the Father and the Son, to be believed in, loved, obeyed, and worshipped throughout all ages.

"II. He is the Lord and Giver of life, everywhere present in nature, and is the source of all good thoughts, pure desires, and holy counsels in men. By him the prophets were moved to speak the word of God, and all writers of the Holy Scriptures inspired to record infallibly the mind and will of God. The dispensation of the Gospel is especially committed to him. He prepares the way for it, accompanies it with His persuasive power, and urges its message upon the reason and conscience of men, so that they who reject its merciful offer are not only without excuse, but are also guilty of resisting the Holy Spirit.

"III. The Holy Spirit, whom the Father is ever willing to give to all who ask him, is the only efficient agent in the application of redemption. He convicts men of sin, moves them to repentance, regenerates them by His grace, and persuades and enables them to embrace Jesus Christ by faith. He unites all believers ·to Christ, dwells in them as their comforter and sanctifier, gives to them the spirit of adoption and prayer, and performs all those gracious offices by which they are sanctified and sealed unto the day of redemption.

"IV. By the indwelling of the Holy Spirit all be-

lievers being vitally united to. Christ, who is the head,
are thus united one to another in the church, which
is His body.    He calls and anoints ministers for
their holy office, qualifies all other officers in the
church for their special work, and imparts various
gifts and graces to its members.    He gives efficiency
to the Word, and to the ordinances of the Gospel.   By
him the church will be preserved, increased until it
shall cover the earth, purified, and at last made per-
fectly holy in the presence of God.

"Chapter xxxv.—Of the Love of God and Missions.

"I. God, in infinite and perfect love, having pro-
vided in the covenant of grace, through the mediation
and sacrifice of the Lord Jesus Christ, a way of life
and salvation, sufficient for and adapted to the whole
lost race of man, doth freely offer this salvation to
all men in the Gospel.

"II. In the Gospel God declares. His love for the
world and His desire that all men should be saved,
reveals fully and clearly the only way of salvation,
promises eternal life to all who truly repent and
believe in Christ, invites and commends all to em-
brace the offered mercy, and by His spirit accompany-
ing the word pleads with men to accept His gracious
invitation.

"III. It is the duty and privilege of every one who
hears the Gospel immediately to accept its merciful
provisions; and they who continue in impenitence and
unbelief incur aggravated guilt and perish by their
own fault.

"IV. Since there is no other way of salvation than
that revealed in the Gospel, and since in the divinely
established and ordinary method of grace faith

cometh by hearing the Word of God, Christ hath commissioned His church to go into all the world and to make. disciples of all nations. All believers are, therefore, under obligation to sustain the ordinances of religion where they are already established, and to contribute by their prayers, gifts, and personal efforts to the extension of the kingdom of Christ throughout the whole earth.''

To all the final action of the general assembly of the Cumberland Presbyterian Church in completing the reunion there was a strong protesting minority, who declined to accede to the lawfulness of the steps leading up to it, or to the conclusion that it had lawfully taken place. This minority now claim that they constitute the true Cumberland Presbytrian Church, and as such are entitled to all of the property belonging to that organization prior to the reunion; that the majority have abandoned the ancient church and creed, and caused themselves to be merged into and swallowed up by another ecclesiastical organization; that, having abandoned the original Cumberland Presbyterian Church, the majority have no interest in or title to any of its property. On the other hand, the majority assert that the union, having been lawfully authorized by a constitutional vote of the general assembly of the church and approved by the necessary majority of the presbyteries, became legally an accomplished fact, and they therefore took with them, as the rightful successors of the original church, the title to and the right to possess all of its property. These conflicting claims present the issue of law arising on the record for our adjudication.

As a rule, it may be stated that where a donor has dedicated property for the purpose of advancing or of disseminating any particular religious doctrine or

faith, if conflicting claims arise as to its ownership or possession, the civil courts will, however delicate or unpleasant the duty, examine into and decide which of the rival claimants is holding to the faith the donor desired to favor, and award the property to him. In other words, they will enforce the trust. This rule prevails, whether the grantee be of the congregational form of government, as the Baptist Church, or an integral part of a more extended form of ecclesiastical hierarchy, such as the Methodist or Presbyterian Church governments. If there be no specific religious trust impressed upon the property, and it belongs to a church of the congregational form of government, and there arises a schism in the congregation and a dispute as to the property, the civil courts, if appealed to, will generally award it to the faction which constitutes a majority of the original congregation, because congregational churches are usually governed by a majority of the members. In the case under discussion, we have neither of the above propositions. The property at Sturgis was not impressed with any specific religious trust, and the congregation for whose use it was conveyed was a part of an ecclesiastical form of government of the presbyterial type.

The Cumberland Presbyterian Church consisted of many congregations, organized into one general government, and its ecclesiastical power was distributed among various tribunals or judicatories, one rising above another in regular gradation from the lowest, the church sessions, which had charge of the affairs of a single congregation, to the highest, the General Assembly, which was the repository of all the ultimate ecclesiastical power of the church. The jurisdiction of these various tribunals is set forth in the several

sections of the constitution copied above, and need not, except as to that of the General Assembly, be referred to further. The Cumberland Presbyterian Church has become divided in fact (leaving out of view for the present whether or not it is so in law), and the line of division separates many congregations; and in each case both factions claim to be the true Cumberland Presbyterian Church, or its lawful successor, and entitled to its property. These disputes have been decided by the courts of last resort of two States, and it is said they are pending in the courts of several others. That of Sturgis has come to us.

When a congregation such as that at Sturgis acquires property for the purpose of religious worship not charged with any specific religious trust, it holds the property, and is entitled to hold and enjoy it, only because the congregation is a part of the general ecclesiastical government; and this right continues so long as the congregation can be identified as an integral part of the general government, but no longer. In such a case, if there be a schism in the congregation and a conflict of claim to the property, the civil courts will look into the question only so far as is necessary to ascertain which of the claimants can be identified with the general church government and award the property to them. If this identification turns upon a decison of an ecclesiastical court of the general church government having jurisdiction to make it, the civil tribunals will award the property in accord with the judgment of the ecclesiastical court. The principle is rested upon the broad proposition that religious organizations are merely voluntary associations, whose constitutions and laws are in their ultimate result, so far as civil tribunals are

concerned, in the nature of contracts between the members; that by joining the association the members agree to conform to its rules and regulations, and to be bound by the decrees of the governing or judicial power of the associations when acting within its proper jurisdiction.

The case of the First Presbyterian Church of Louisville v. Wilson, 14 Bush 252, involved a principle nearly akin to the one under consideration. In the opinion the court said: "Religious societies are regarded by the civil authority as other voluntary associations, the individual members and separate bodies of which will be held to be bound by the laws, usages, customs, and principles, which are accepted among them, upon the assumption that in becoming parts of such organizations they assented to be bound by those laws, usages, and customs as so many stipulations of a contract between them. It is only by so regarding the association of individuals or bodies for religious purposes that the civil authority in this country can interfere at all, and then it can interfere only so far as may be necessary to decide upon and protect the rights of property depending upon the contract between the parties. And when that contract has been construed by the parties the courts will, as in other cases, follow their own construction. * * * Congregations are bound by the action of their respective sessions, if the matter determined be within its jurisdiction, and the sessions are bound in like manner by the action of their presbyter, presbyteries by the action of their synod, and synods by the the action of the General Assembly." The case above cited involved a contest between two factions of a Presbyterian congregation for the title and possession of the church property. The court awarded it

to the minority claimants, because they were identified as that "Presbyterian church and Presbyterian session and congregation" for whose use the property was conveyed.

The case of Watson v. Jones, 13 Wall 679, 20 L. Ed. 666, arose out of a conflicting claim of two factions of a Presbyterian church for the church property. The conflict concerned the right of the synod to order the election of elders. The supreme court, in its opinion, discussed the question in a broad and thorough manner, and among other things said of the principle we have before us the following: "But the third of these classes of cases is the one which is oftenest found in the courts, and which, with reference to the number and difficulty of the questions involved, and to other considerations, is every way the most important. It is the case of property acquired in any of the usual modes for the general use of a religious congregation which is itself part of a large and general organization of some religious denomination, with which it is more or less intimately connected by religious views and ecclesiastical government. The case before us is one of this class, growing out of a schism which has divided the congregation and its officers, and the presbytery and synod, and which appeals to the courts to determine the right to the use of the property so acquired. Here is no case of property devoted forever by the instrument which conveyed it, or by any specific declaration of its owner, to the support of any special religious dogmas, or any peculiar form of worship, but of property purchased for the use of a religious congregation, and so long as any existing religious congregation can be ascertained to be that congregation, or its regular and legitimate successor, it is entitled to the use of the

property. In the case of an independent congregation we have pointed out how this identity or succession is to be ascertained; but in cases of this character we are bound to look at the fact that the local congregation is itself but a member of a much larger and more important religious organization, and is under its government and control, and is bound by its orders and judgments. There are in the Presbyterian system of ecclesiastical government, in regular succession, the presbytery over the session or local church, the synod over the presbytery, and the general assembly over all. These are called, in the language of the church organs, 'judicatories,' and they entertain appeals from the decisions of those below, and prescribe corrective measures in other cases. In this class of cases we think the rule of action which should govern the civil courts, founded in a broad and sound view of the relations of church and State under our system of laws and supported by a preponderating weight of judicial authority, is that, whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law, have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them.    *    *    *
There is, perhaps, no word in legal terminology so frequently used as the word 'jurisdiction,' so capable of use in a general and vague sense, and which is used so often by men learned in the law without a due regard to precision in its application. As regards its use in the matters we have been discussing, it may very well be conceded that if the general assembly of the Presbyterian Church should undertake to try one of its members for murder, and punish him with death

or imprisonment, its sentence would be of no validity in a civil court or anywhere else.  Or if it should at the instance of one of its members entertain jurisdiction as between him and another member as to their individual right to property, real or personal, the right in no sense depending on ecclesiastical questions, its decision would be utterly disregarded by any civil court where it might be set up.  And it might be said in a certain general sense very justly that it was because the General Assembly had no jurisdiction of the case.  * * *  But it is a very different thing where a subject-matter of dispute, strictly and purely ecclesiastical in its character—a matter over which the civil courts exercise no jurisdiction—a matter which concerns theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them, becomes the subject of its action.  It may be said here, also, that no jurisdiction has been conferred on the tribunal to try the particular case before it, or that, in its judgment, it exceeds the powers conferred upon it, or that the laws of the church do not authorize the particular form of proceeding adopted; and, in a sense often used in the courts, all of those may be said to be questions of jurisdiction.  But it is easy to see that, if the civil courts are to inquire into all these matters, the whole subject of the doctrinal theology, the usages and customs, the written laws, and fundamental· organization of every religious denomination may, and must, be examined into with minuteness and care; for they would become, in almost every case, the criteria by which the validity of the ecclesiastical decree would be determined in the civil court.  This principle would deprive these

bodies of the right of construing their own church
laws, would open the way to all the evils which we
have depicted as attendant upon the doctrine of Lord
Eldon, and would, in effect, transfer to the civil
courts where property rights were concerned the
decisions of all ecclesiastical questions.''

Prior to the year 1844 the Methodist Episcopal
Church of the United States, having become divided
in sentiment on the subject of slavery, the General
Conference in that year authorized a division of the
church between the North and the South; and as a
result there was set up south of Mason and Dixon's
line what is known as the Methodist Episcopal
Church South.  Before the separation the church as
a whole possessed a very valuable property called
the ''Methodist Book Concern.''  After the separa-
tion the right of the Church South to participate in
the fund or property was denied; it being said,
among other things, that the General Conference was
without power to divide the church, and that those
churches in the South which had availed themselves
of the permission of the General Conference had
thereby voluntarily left the original church and lost
all beneficial interest in the property of that institu-
tion.  The litigation which grew out of this conflict
of interest reached the Supreme Court in the case of
Smith v. Swornstedt, 16 How. 288, 14 L. Ed. 942;
and in holding that the separation of the church
into two jurisdictions was within the inherent au-
thority of the General Conference, and that the
common property was to be divided ratably between
the two churches, the court, through Mr. Justice Nel-
son, said: ''It is insisted, however, that the General
Conference of 1844 possessed no power to divide the
Methodist Episcopal Church as then organized, or

to consent to such division, and hence that the organ-
ization of the Church South was without authority,
and the traveling preachers within it separated from
an ecclesiastical connection which is essential to
enable them to participate as beneficiaries. Even if
this were admitted, we do not perceive that it would
change the relative position and rights of the travel-
ing preachers within the divisions North and South
from that which we have just endeavored to explain.
If the division under the direction of the General
Conference has been made without the proper au-
thority, and for that reason the traveling preachers
within the Southern division are wrongfully sep-
arated from their connection with the church, and
thereby have lost the character of beneficiaries, those
within the Northern division are equally wrongfully
separated from that connection, as both divisions
have been brought into existence by the same au-
thority. The same consequence would follow in
respect to them that is imputable to the traveling
preachers in the other division, and hence each would
be obliged to fall back upon their rights as original
proprietors of the fund. But we do not agree that
this division was made without the proper authority.
On the contrary, we entertain no doubt but that the
General Conference of 1844 was competent to make
it, and that each division of the church, under the
separate organization, is just as legitimate and can
claim as high a sanction, ecclesiastical and temporal,
as the Methodist Episcopal Church first founded in
the United States. The same authority which
founded that church in 1784 has divided it, and es-
tablished two separate and independent organiza-
tions occupying the place of the old one. In 1784,
when this church was first established, and down till

1808, the General Conference was composed of all the traveling preachers in that connection. This body of preachers founded it by organizing its government, ecclesiastical and temporal, established its doctrines and discipline, appointed its superintendents or bishops, its ministers and preachers, and other subordinate authorities to administer its policy and promulgate its doctrines and teachings throughout the land. It cannot, therefore, be denied—indeed, it has scarcely been denied—that this body, while composed of all the traveling preachers, possessed the power to divide it and authorize the organization and establishment of the two separate independent churches. The power must necessarily be regarded as inherent in the General Conference. As they might have constructed two ecclesiastical organizations over the territory of the United States originally, if deemed expedient, in the place of one, so they might, at any subsequent period. The power remaining unchanged. * * * The division of the Methodist Episcopal Church having thus taken place, in pursuance of the proper authority, it carried with it, as matter of law, a division of the common property belonging to the ecclesiastical organization, and especially of the property in this Book Concern, which belonged to the traveling preachers. It would be strange if it could be otherwise, as it respects the Book Concern, inasmuch as the division of the association was affected under authority of a body of preachers who were themselves the proprietors and founders of the fund.''

The authority of the General Conference to make the division of the church, discussed in the last-cited case, was also challenged in the case of Gibson v. Armstrong, 7 B. Mon. 481. The question arose in

this way: A part of the congregation worshipped at
Maysville, Ky., denied the power of the General
Conference to separate the church, and refused to
join the Southern jurisdiction. This created a divi-
sion of the congregation, and a conflict arose as to
the ownership of the church property at that place.
It was contended there, as in the Supreme Court, that
the General Conference lacked power to make the
division. In the opinion, upholding the power of
the General Conference, our court, among other
things, said: "That a church organization, a self-
created body, subject, so far as its own constitution
and organization are concerned, to no superior will,
cannot by its own assent authorize and legalize its
own dismemberment, is a proposition contradicted
by reason and analogy. That such a measure is in-
consistent with the motives and ends of its institu-
tion is no more true with regard to such a body than
with regard to other associations, private or national.
* * * The complainants, indeed, seem not to rely
upon the popular principle, which would refer a
question affecting numerous individuals to the deci-
sion of the majority, but rather upon some supposed
indefeasible right of the individual member to or
in the unity and identity of the Church, and its juris-
diction or protection, which, rising above all the
powers of the church, would enable a minority, how-
ever small, or perhaps a single individual, to obstruct
or defeat, in a question of dismemberment, the will
and action of the entire residue of the church. But
we perceive no foundation for the assertion of such
a right in any provision or restriction of the Con-
stitution, and the rights of individuals as founded
in or measured by the duty of protection on the part
of the entire association, or its governing power,

must yield, as we have seen, to those occasions which justify or require dismemberment, and which are to be authoritatively judged of, not by a minority nor by each individual member, but either by the majority of individual members or by that power which is authorized to act for the whole. To say that the church could not be legally or rightfully divided according to its organic or territorial parts, without the unanimous consent of all the members of the entire church, or even of all the members of the part proposed to be separated, would be to deny the power of division by any mode of action, since it would subject it to an impossible condition. And to say that a division could only take effect as to those individuals who should consent to it, and must be wholly ineffectual as to others, would not only change its character from an organic or territorial dismemberment to a mere numerical or individual separation, but would illustrate one of the most useful objects of the power, by producing that confusion and discord, the avoidance of which is a just ground of its exercise.''

It will be observed that the question involved in the two last-cited cases is the converse of that before us. There the supreme ecclesiastical power had been exercised to divide a united church; here the same power has been invoked to reunite a divided church. There the power to divide was challenged, because it was urged in effect that ''division is death, and no church organization has the inherent power of self-destruction.'' Here the power to reunite a divided church is denied because, it is said ''union is death, and no church has the inherent power of self destruction.'' To the first of these antithetical propositions

the Supreme Court and our own made answer as above set forth.

The case of McGinnis v. Watson, 41 Pa. 9, involved a question similar to the one at bar.    Two synods of different branches of the Presbyterian Church by united action coalesced into one.    One of the congregations divided upon the question of the power of the synods to unite, and each faction claimed the property to the exclusive of the other. The Supreme Court of Pennsylvania upheld the party acting in conformity with the decision of the synod. In the opinion upholding the union, it is said: "How far is the congregation bound by the act of its synod? Religious societies are not free, if they may not choose their own form of organization.    They may organize as independent churches, and then their law is found in their own separate institutions, customary or written.    Or they may organize as associated churches, and then their law is to be found in their own rules, and in those of the associated organism.    When persons join a church belonging to such a general organism, they assent to its laws, and are entitled to the implication that the affairs of the church are to be managed according to them.    This result of our law, and of the relations of associates in churches, is so clear, obvious, and necessary that we need not dwell upon it."   And in concluding its opinion the rule that we are attempting to establish was thus stated: "But one of the very ablest judicial opinions that we find in our books on this subject is that of Chief Justice Marshall, of Kentucky, in Gibson v. Armstrong, 7 B. Mon. 481, wherein it is decided that in general organizations of united churches the law of the general organism is binding on all the individual churches, and that even a majority,

seceding, lose all their rights in the church property. And this view we find ably supported by several other decisions. Harper· v. Straws, 14 B. Mon. 48; Den v. Pilling, 24 N. J. Law, 653; The John's Island Church Case, 2 Rich. Eq. (S. E.) 215. A contrary rule would encourage partisan strifes in congregations and in general church organisms, for the purpose of unjustly getting possession of church property, and would endanger the peace and effective social force of all church unions—a position which the State and its law ought not to occupy. We think the defendants, now incorporated, are entitled to this property.'' To the same effect are Brundage v. Deardorf, 92 Fed. 214, 34 C. C. A. 304; Schweiker v. Husser, 146 Ill. 399, 34 N. E. 1022; Lamb v. Cain, 129 Ind. 486, 29 N. E. 13, 14 L. R. A. 518; Watson v. Avery, 65 Ky. 322; Trustees of Trinity M. E. Church of Norwich v. Harris, 73 Conn. 216, 47 Atl. 116, 50 L. R. A. 636; White Lick Quarterly Meeting of Friends, by Hadley et al., Trustees, v. White Lick Quarterly Meeting of Friends, by Memdenhall et al., Trustees, 89 Ind. 136; McBride v. Porter, 17 Iowa, 204.

We think the foregoing authorities establish beyond question that, unless there is something in the constitution of the Cumberland Presbyterian Church, as it existed before the union, which denied jurisdiction to the General Assembly, with the approval of the presbyteries, to authorize the union under discussion, the action by which the two churches were reunited must be held valid and binding so far as the civil courts are concerned.

Appellees rely with great confidence upon the provisions of section 25 of the constitution as indicating that the various ecclesiastical judicatories mentioned

in the section have only the jurisdiction expressly
delegated by the constitution.     After defining the
jurisdiction of the various courts, section 25 contains
the following: "And the jurisdiction of these courts
is limited by the express provisions of the constitu-
tion." This, it is insisted, means that the constitu-
tion of the church is a delegation of powers, in the
sense that the Constitution of the United States is
a delegation of national powers by the states.     But
to this construction we cannot agree.     Certainly the
constitution is a limitation on the powers of the
various ecclesiastical tribunals; but it is a limitation
in the sense that State Constitutions are limitations
upon the inherent power of their Legislatures and
of the people.     If it had been meant to express the
idea that the constitution of the church was a dele-
gation of powers, the word "to," instead of "by,"
would have been used, and the expression would then
have been: "And the jurisdiction of these courts is
limited to the express provisions of the Constitu-
tion." A consideration of the whole church govern-
ment, as set forth in the Confession of Faith and
constitution, leads to the belief that the various
church judicatories are the repositories of all the
ecclesiastical powers of the church, except as limited
by the express provisions of the constitution.     Sec-
tion 108 of the Confession of Faith provides that
"the Lord Jesus, as king and head of His church,
has therein appointed a government intrusted to
church officers distinct from the civil government."
Section 110: "Church government implies the exist-
ence of church courts, invested with legislative,
judicial, and executive authority; and the Scriptures
recognize such institutions, some of subordinate and
some of superior authority, each having its own par-

ticular sphere of duties and privileges in reference
to matters ministerial and ecclesiastical, yet all sub-
ordinate to the same general design.'' Section 111:
''It is the prerogative of these courts ministerially
to determine controversies of faith and questions of
morals, to set down rules and directions for the better
ordering of the public worship of God and govern-
ment of His church, to receive complaints in cases
of maladministration, and authoritatively to deter-
mine the same, which determinations are to be re-
ceived with reverence and submission.'' All of this,
taken in connection with the vast powers recognized
as existing in the various church courts by the
various sections of the constitution heretofore copied,
and especially as to the General Assembly by the
provisions of section 43, indicates to our satisfaction
that the church courts have all ecclesiastical power
appertaining to the Presbyterian form of govern-
ment, except as limited by the provisions of the con-
stitution, and that it was not contemplated by the
founders of the church that the civil authorities
should ever be called upon to decide any ecclesiastical
question.

But, passing this for the present, and for the pur-
pose of the argument assuming that the constitution
of the church is a delegation of enumerated powers,
did the General Assembly by the express terms of the
constitution have the power to authorize the union
which took place between the two churches? Among
the various comprehensive and far-reaching powers
recognized by section 43 as appertaining to the Gen-
eral Assembly, we find that ''the General Assembly
shall have power * * * to receive under its juris-
diction other ecclesiastical bodies whose organiza-
tion is conformed to the doctrine and order of this

church; to authorize synods and presbyteries to exercise similar power in receiving bodies suited to become constituents of those courts, and lying within their geographical bounds respectively. * * *'' The appellees deny that the foregoing provision of the constitution authorizes the General Assembly to unite with another church; and they insist that the language used precludes the idea that the power to receive under its jurisdiction other ecclesiastical bodies includes the right or power to unite with a larger church and to take its name and ecclesiastical organization as its own. This, they say, is not receiving other ecclesiastical bodies, but is a merger of the Cumberland Presbyterian Church into a foreign organization. This, we think, is placing too narrow a construction upon the language under consideration; and the words of Chief Justice Marshall, in the great case of McCulloch v. State of Maryland, 4 Wheat. 316, 4 L. Ed. 579, become pertinent: "A constitution, to contain an accurate detail of all the subdivisions of which its great powers will admit, and of all the means by which they may be carried into execution, would partake of the prolixity of a legal code, and could scarcely be understood by the public. Its nature, therefore, requires that only its great outlines should be marked, its important objects designated, and the minor ingredients which compose those objects be deduced from the nature of objects themselves. * * * In considering this question, then, we must never forget that it is a constitution we are expounding."

It will be observed that the ecclesiastical bodies authorized to be received are organizations similar in extent to that represented by the General Assembly of the Cumberland Presbyterian Church. The

General Assembly is not given power to receive similar bodies, or bodies similar to its own synods or presbyteries. Such bodies the synods and presbyteries are authorized to receive. It seems to us clear that organizations such as the Presbyterian Church in the United States of America are the kind or class which the General Assembly of the Cumberland Presbyterian Church was authorized to receive under its jurisdiction; and we presume it would not be questioned that, if the Presbyterian Church had adopted verbatim the Confession of Faith and constitution of the Cumberland Presbyterian Church, it could have been received by the latter under the power granted by section 43 of the constitution. It is not contended that the organization of the Presbyterian Church is substantially different from that of the Cumberland Presbyterian Church, except on the doctrinal points as to predestination before mentioned. The question, then, arises: Did the Confession of Faith of the Presbyterian Church, after the declaration of 1903, above quoted, conform to the Confession of Faith of the Cumberland Presbyterian Church? And, if there be a difference of opinion on this question, who is the proper judge to decide it? As the General Assembly is to receive the foreign organization, certainly it seems reasonable that it should have the power to judge of the fact as to whether or not it ought to receive it; or, in other words, it is necessary that the General Assembly shall judge of the fact as to whether the organization of the foreign church does conform to that of the Cumberland Presbyterian Church in order to decide whether it shall be received. Manifestly this is a question of doctrine, faith, and church government, and the decision of the General Assembly is beyond

the jurisdiction of the civil tribunals for the purposes of review.

But, even if we are mistaken in the view that the constitution, as it originally stood, did authorize the union, we are of opinion that the action taken amended the constitution. By section 60 of the constitution of the Cumberland Presbyterian Church, upon the recommendation of the General Assembly, at a stated meeting, by a two-thirds vote, the Confession of Faith or constitution of the church may be amended or changed, when a majority of the presbyteries, upon the same being transmitted for their action, shall approve thereof. This is, upon the one hand, a limitation upon the power of the General Assembly. Under it the General Assembly may not change the Confession of Faith or constitution of the Church except by a two-thirds vote of its members, and not then until a majority of the presbyteries, upon the matter being transmitted for their action, shall approve of it. But, on the other hand, it is necessarily a grant of power to the General Assembly to change the Confession of Faith or constitution of the church by a two-thirds vote of its members, with the approval of a majority of the presbyteries, upon the matter being transmitted for their action. This power of the General Assembly is plenary; i. e., it may make any change it sees fit in the constitution or in the Confession of Faith of the church, by a two-thirds vote of its members, when the change is approved by a majority of the presbyteries. Under this power the General Assembly might, in changing the constitution of the church, change the name of the church and adopt another name; and, under it, it might adopt an entirely new Confession of Faith. There is no limit to its power, provided two-thirds

of its members concur in the action, the action which
it takes is approved by a majority of the presby-
teries.    In this way the name of the Cumberland
Presbyterian Church might have been changed to the
Presbyterian Church in the United States of America,
and the standards of the church as they then were
might have been set aside, and the standards of the
Presbyterian Church in the United States of Amer-
ica might have been substituted for them.    What
the General Assembly could do by a series of reso-
lutions, it could do at one time in one resolution.
While the proposed plan of union was not in name a
change of the constitution and Confession of Faith
of the Cumberland Presbyterian Church, the effect
of the adoption of the plan was to give the church
a new name, a new constitution, and a new Confes-
sion of Faith.    The adoption of the plan of union
and the carrying of that plan into effect necessarily
carried with it both of these things.    The members of
the General Assembly who voted for it and the pres-
byteries who approved it necessarily so understood
the matter.    To unite the Cumberland Presbyterian
Church with the Presbyterian Church in the United
States of America, and form one church of the two,
was, it is true, a far-reaching amendment to the con-
stitution and standards of the Cumberland Presby-
terian Church.    But the power of the General As-
sembly to make changes is unlimited, provided two-
thirds of its members vote for the change, and the
change is approved by a majority of the presbyteries.

The Cumberland Presbyterian Church not being
congregational in its form of government, it is im-
material how the members of the Sturgis church
stood in regard to the proposed change.    The power
to make the change is vested in the General Assembly

and the presbyteries; the congregation having no voice in the matter. In this particular the constitution of the Cumberland Presbyterian Church is not unlike the Constitution of the United States. When Congress adopts an amendment to the Constitution of the United States, and it is ratified by the Legislatures of the required number of states, the people of a state have no voice in determining whether the amendment shall be adopted or not, and it takes effect, although the people of the particular state may be opposed to it unanimously. In the case before us, the change was regularly made by a two-thirds vote of the General Assembly, and, their action having been approved by a majority of the Presbyteries, upon the matter being regularly transmitted to them, it became final, and is binding upon all the members of the church. It was not contemplated by the founders of the Cumberland Presbyterian Church that its constitution and Confession of Faith should necessarily remain forever unchanged. They saw fit to provide how they may be changed, and when the change has been made in the manner provided by the organic law of the church all are bound by it. The founders of the church recognized that ultimate power should be vested somewhere in this matter, and the action of those in whom the ultimate power was vested is final and conclusive.

In order to uphold the judgment of the circuit court in this case, we must decide that there was no power or authority in the Cumberland Presbyterian Church, short of the acquiescence of every member, to effect the union which took place. This we have tried to show is untenable. We are strengthened in this conclusion by the historical position of the church on this subject from the very beginning of

its existence. In 1810 a circular letter was written and circulated by the founders of the new church explaining its position, in which occurred these sentences: "We should just add that we have it in view as a presbytery to continue, or to make another proposition to the Synod of Kentucky, or some other synod for a reunion. If we can obtain it without violating our natural and scriptural rights, it will meet the most ardent wish of our hearts. If we cannot, we hope to be enabled to commit ourselves and our cause to Him who is able to keep us." In a resolution of the Cumberland Presbytery, adopted in 1813, it was recited that "this Cumberland Presbytery have made every reasonable effort to be reunited to the General Presbyterian Church. * * *" In 1860 the following resolution was adopted by the General Assembly: "Resolved, that, while we are ready to reciprocate fraternal feelings alike with all Christians, yet seeing that the great Presbyterian family embrace alike the same church government, and that in their oral addresses they are doctrinally converging to the same standpoint, the sovereignty of God and the agency of man both alike exercised and secured in the salvation of the sinner, we cherish the fond hope that the day is not far distant when the entire family shall be represented in one General Assembly." In 1867 a committee was appointed "to prepare a suitable minute for the action of this Assembly on the subject of organic union with the Presbyterian Church, as brought before this body by Rev. T. D. Witherspoon, the corresponding delegate from the General Assembly of said Church, and Rev. C. A. Davis, D. D., the delegate from our last General Assembly to that body." In 1882 the General Assembly had under consideration the union of the

Cumberland Presbyterian Church with the Evangelical Lutheran Church. In 1885 the Moderator of the General Assembly appointed a committee on organic union with the Methodist Protestant Church. The effort to effect a union with the Methodist Church seems to have been discontinued because of adverse action on organic union by the General Conference of that Church. Afterwards, as before stated, the movement was inaugurated which consummated in 1906 in the union under consideration.

It will thus be seen that the Cumberland Presbyterian Church, from its very beginning, has ardently desired a reunion with the mother church, and has sought on several occasions a union with churches other than the Presbyterian. The men who founded this church, and those who, from time to time, have constituted its General Assembly, were doubtless wise, candid, and conscientious Christian people; and it is inconceivable that they, having officially declared and shown in every way possible that they desired a reunion with the mother church during the hundred years of the existence of the Cumberland Presbyterian Church, should deliberately establish a constitution which forbade such union. And yet this is what we must find to be the truth, if the position of appellee is to be upheld. We are told that "union is death," and that it is not to be supposed that the fundamental law of a religious organization makes provision for its destruction. If this proposition be sound, then we are forced to the belief that the Cumberland Presbyterian Church has been seeking self-destruction for nearly a century. Is it true that union is death? If by this rather dramatic statement anything more is meant than that by the consummation of the union the entity known as

the Cumberland Presbyterian Church·ceased to exist, we cannot give our assent to its soundness. It would seem that the very reverse of· the proposition is true. As a rule union means strength and life, and when applied to such a union as that under consideration it means a wider horizon of usefulness, a larger field for service, and a multiplied opportunity for propagating the gospel and doing the will of the Master. Is any congregation destroyed by the union, or any presbytery or synod? Are not all the members still organized under the Presbyterian form of government, with even greater opportunities for usefulness than they formerly had? Surely this is a strange statement to be made concerning the union of two branches of that great church whose keystone is the belief in the doctrine of the Trinity, and whose Confession of Faith contains the following: "In the unity of the Godhead there are three persons of one substance, power, and· eternity, God the Father, Son, and Holy Spirit."

A question very similar to that we have here arose in the case of Central University of Kentucky v. Walters' Ex'rs, 122 Ky. 65, 90 S. W. 1066, 28 Ky. Law Rep. 1041. Walters had agreed to donate a sum of money to Central University, located at Richmond, Ky., and had given his note for the amount of the donation. Afterwards Central University was united and consolidated with Centre College, at Danville, Ky., after which Walters instituted an action for a cancellation of his note, claiming that the consideration for it had failed; that Central University, by being moved away from Richmond, Ky., and consolidated with Centre College, at Danville, Ky., had been annihilated, and therefore the maker of the note was entitled to a cancellation. But the soundness of

this contention was denied, and this court, in an opinion by Judge O'Rear, said in part: "While the statute provides that the old corporations shall cease to exist upon such consolidation, it was never intended to destroy anything except the separate identity, the shell, as it were, preserving, however, all that was vital or valuable. The object was, not to destroy, but to preserve and enlarge. The result is amalgamation, not annihilation. * * * The original corporate existence is merely a legal status. It is not a thing at all. The power that gave it its so-called existence is competent to change it into a new being, with all the rights and attributes of the old. No physical phenomenon is involved. The legislative purposes, and the practical application of it, will not stagger in execution at an imaginary difficulty in harmonizing a thing dead with a thing which is alive. We are of opinion, and hold, that the effect of the consolidation was to continue in the new corporation, Central University of Kentucky, all the franchises, and vest in it all the property rights, subject to the terms upon which it was acquired, of the two constituent corporations, the Central University of Kentucky and Central College of Kentucky."

In the case of Mack et al. v. Kime et al., 129 Ga. 1, 58 S. E. 184, the validity of the very union involved in this case arose in the state of Georgia, and the Supreme Court of that state, in a most exhaustive opinion, discussed every phase of the question which we have before us, and reached the conclusion that the right of the General Assembly of the Cumberland Presbyterian Church to unite that organization with the Presbyterian Church was an ecclesiastical question, the decision of which was exclusively in the

highest judicatory of that church, and, this tribunal having decided in favor of the power and its consummation, the civil tribunals would acquiesce therein and award the church property in accordance therewith. The opinion of Chief Justice Cobb leaves nothing to be desired, either in the historical presentation of the facts leading up to the union, in the review of the authorities bearing upon the question, or in the legal deductions flowing therefrom; and upon its firm framework we lean with great confidence.

The case of Fussell et al. v. Hall et al., 233 Ill. 72, 84 N. E. 42, did not involve a question of property rights, and the opinion does not throw any light upon the question at issue here.

There is no merit in the contention of appellees, that the union deprives them of their property. This plea begs the whole question. They never had an interest in the property, except as members of the congregation while it was an integral part of the general ecclesiastical organization known as the Cumberland Presbyterian Church. If the General Assembly and the presbyteries of that church had a right to effect the union of which they complain, their interest in the church property can be made to continue only by their remaining in the new organization, which, as we have shown, is the lawful successor of the former organization. If they do not choose to follow the decrees of their church judicatories, they, of course have the power to foresake the church; but, when they leave it, they abandon all interest in its property. This was the contract made when they entered the church, and this contract the civil courts will enforce in the only way they can enforce it—by requiring the property to follow the direction indicated by the judgments of the ecclesi-

astical tribunals having jurisdiction of the subject-matter.

In conclusion, we deem it not improper to say that, owing to the great importance of the question involved in this case, we have given it our most careful and impartial attention. The question whether or not the various families of the Presbyterian faith must remain ever separated, although the causes which originally divided them have disappeared in the light of modern theological evolution, is one which must give solicitude to all who have the advancement of civilization at heart. The history of the Presbyterian Church is the history of a very large part of what we know and enjoy of civil and religious liberty. The teachings of her faith are such as have always attracted to her the most lofty minds and the boldest spirits. In following her path through the pages of history, whether her votaries be called Lutherans, as in Germany, Hugenots, as in France, Covenanters, as in Scotland, or Puritans, as in England, they will always be found to be among the bravest and the best. As a religious organization, she had no compromise along the lines of conscience to make with power, and could be deflected from the path of recitude neither by the frown of authority nor the blandishments of corruption. With the same indomitable courage she confronted the haughty princes of the House of Tudor and the crowned weaklings of the House of Stuart. With the same words of scornful condemnation she rebuked the sins of Messalina on the throne and the wanton in the street. Her path has led her oftener into exile than into favor with the great—oftener to the dungeon and the stake than to the pleasure of kings' houses or the friendship of courtiers. But under

her searching gaze the shackles have fallen from the human mind, and the divine right of kings has shrunk to the mean thing it now appears. Wherever a battle was to be fought for human liberty, whenever a forlorn hope was to be led, or a mine braved for conscience sake, whenever the blood of a martyr was needed as a testimony to truth, her answer was always that of the prophet of old: "Here am I; send me."

The judgment is reversed, with directions to dismiss the petition.

SETTLE, C. J., not sitting. NUNN, J., dissents.

Petition for rehearing by appellee overruled.