Hobbhbimbr, J.
This controversy grows out of an attempt by the Presbytery to unite into one church, to be known as “the Presbyterian Church of the Covenant,” the First Presbyterian, the Second Presbyterian and the Central Presbyterian Congregations.
As was said by Roby, J. in Ramsey v. Hicks (a church uniop case), 87 N. E. Rep., 1091-1099, “Union means agreement, concord, harmony.”
But from the very outset of this hearing', the court could not but be impressed with the wide-spread discord and dissatisfaction over this union manifested not only by members of Presbytery, but by the people who compose the First Presbyterian Congregation, the great majority of whom have .been, and still are, opposed to this union of their church with the two other churches named.
The merger resolution was passed in Presbytery 'by a vote of twenty-eight to twenty-two. Subsequently thirty-three members of Presbytery filed “complaints” with Synod.
The reasons for the protests of these thirty-three ministers and laymen will be found in Exhibit 21-1.
Synod dismissed these ‘1 complaints, ’ ’ and thereafter the highest judicatory of the church, the General Assembly of the United States, with which “complaints” against Synod had been filed, likewise dismissed said ‘ ‘ complaints. ’ ’
All these “complaints,” together with the grounds of same, are of record herein.
The evidence shows that the merger resolution undertakes to establish a union, for which not only no majority of the people who compose the First Presbyterian Congregation have voted, but as a matter of fact, and as will appear, such a proposition was never before them.
Naturally, then, this court early in these proceedings, found itself experiencing doubts as to the power, even under Presby *533 terian law,'by which plaintiff’s property could be taken from it under such circumstances and handed over to strangers, and to new and different uses. Nor were such doubts dispelled by the fact that many members of Presbytery likewise seemed to have questioned such power, 'among whom, incidentally may be noted, Dr. E. T. Swiggett, relied on by both sides in this trial as an expert on Presbyterian law.
It may be stated here, that the “complaints” alluded to were not in the nature of “appeals” entitling the original parties to another hearing (Sec. 94, Bk. of Dis.). Appeals only lie to a judicial decision under Presbyterian law, and “complaints” to legislative action.
These ‘ ‘ complaints, ’ ’ then, were filed in Synod and in the General Assembly by protesting members of Presbytery -and on their otun behalf, and not on behalf of the plaintiff, or of the people who composed the First Presbyterian Congregation.
These people had no right of appeal to the action of Presbytery, nor did they have any legal right of “complaint.” Indeed, they had no legal right to be heard or to defend, although their property was at stake, and if any hearing was accorded to an individual or individuals (other than the “complaints” above alluded to), it was1 not a hearing granted to these people, but to these individuals by grace only.
In view, therefore, of this remarkable situation, involving as it does civil property rights, and in view of the many novel and grave questions, and of the high character of all these litigants, I have gone into the mass of testimony, exhibits, Presbyterian law, and the copious citations, and into the unusual and difficult problems, with considerable care.
In attempting to come to a proper and just determination of this gause, I am mindful of the respect and deference due to ecclesiastical courts, in a country such as ours, where church and state are separate. But at the same time I have not forgotten that it is the bounden duty of the civil courts, under our system, to .safeguard civil property rights — things peculiarly within the civil court’s jurisdiction.
Plaintiff is now in such court, and is invoking the protection of the civil court in respect of such rights.
*534 The pleadings in this case cover forty-five typewritten pages; it is therefore impossible to more than briefly state the issues.
• Plaintiff’s pleadings attack, as invalid, the alleged merger resolution, claiming that the proceedings leading up to it and the resolution itself were invalid; that Presbytery’s action represents an attempt to divert plaintiff’s property, to which as a corporation it claims title and actual possession, and to apply it to new purposes, without plaintiff’s legal consent. It avers that the officers of the new church have attempted to take possession of plaintiff’s property; to deprive plaintiff of the right to conduct religious services therein; that defendants threaten to interfere with plaintiff’s control and possession. The prayer is for equitable relief against such alleged interference.
The defendant, on the other hand, by its pleadings, avers the nature of the Presbyterian church at large; it sets up the connection of the First Church with it; it describes in detail the church organization and its judicatories (Session, Synod, General Assembly), and it avers the power of Presbytery to unite churches; it avers that the title to the property involved is held in trust for the First Church — a spiritual body; it details the movements for union of the down town churches, and the proceedings before the constituent churches, resulting in merger into the Presbyterian Church of the Covenant; it sets .up proceedings before Presbytery and likewise complaints to Synod and to the General Assembly, and pleads dismissal by these bodies of such complaints, thus in effect, affirmance by the highest judicatory of the action of Presbytery.
Defendant contends that as a result of Presbytery’s action, the Presbyterian Church of the Covenant became the ecclesiastical successor of the constituent churches and as such the succeeding, beneficiary in such trust, entitled to all the rights and interests formerly owned by them and every one of them; and by way of cross-petition, prays that possession of the real estate of the First Church be decreed to them. '
In short, it is claimed by the plaintiff that the alleged merger represents an attempt by defendant to deprive it of its property, contrary to the organic laws of the Presbyterian organization, the constitutional guaranties of nation and of state, and contrary to the statutory law of Ohio, as well.
*535 On the other hand, it is the contention of defendant, that the ecclesiastical fact of union of the three churches having been legally effected, the Presbyterian Church of the Covenant became the ecclesiastical successor of said former First Presbyterian Church of Cincinnati. And it is claimed that inasmuch as said finding has been affirmed and settled by the highest judicatory of the Presbyterian Church in the United States, the judgment is binding on this court and must be taken as established, and that this court must apply said facts, in determining the identity of the beneficiary of said trust property, and award the property to it.
Reliance for the proposition .advanced by defendant is placed on the celebrated case of Watson v. Jones, 13 Wall., 679, United States Supreme Court, wherein the court, through Mr. Justice Miller, say :
' ' In this class of cases we think the rule of action which should govern the civil courts, founded in a broad and sound view.of the relations of church and state under our system of laws and supported by the preponderating weight of judicial authority is, that, whenever the questions of discipline or of faith or ecclesiastical rule, custom or law, have been decided by the highest of these church judicatories, through which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding upon them, in their application to the case before them. ’ ’
A number of other eases are cited, notably, Mack v. Kime, 120 Ga., 17; Wallace v. Hughes, 115 S. W. Rep., 684 (Ky.); Brown v. Clark, 116 S. W. Rep., 360 (Texas) ; Com. of Missions v. Synod, 106 Pac. Rep., 395, Syl. 13, and others.
Now the Plan of Union' adopted by the joint committee of the First and Second Churches, and the Preliminary Agreement and proxies or consents (after Preamble), were as follows:
“We unanimously recommend the following plan:
“ (1) The corporate name of the church formed by the union shall be 'The .Presbyterian Church of the Covenant in Cincinnati. ’
“ (2) All such steps shall be promptly taken as may be required by the Presbyterian form of government and by the statutes of Ohio to complete the union, and such union shall take place and be made effective by the Presbytery of Cincinnati at the earliest possible date.
*536 “ (3) The initial boards of trustees, elders and deacons of the new church shall be made up of the present boards of the two churches or their immediate successors, and shall continue in office until their successors are elected in such manner for such terms and at such time as the new church shall prescribe.
“ (4) Each ehurch shall duly transfer and convey to the new church, (1) all its assets and property of every kind, subject to existing contracts, obligations or trusts, and, (2) all trust estates, trust funds, endowment funds, and all interests in or liens upon any property which are held or controlled by such ehurch. The new church shall assume, perform and discharge all trusts, contracts and obligations connected therewith.
“(5) A suitable church edifice and accompanying buildings shall be provided for the new church, either by remodeling that of the Second Church, or by its demolition and the erection of the new buildings on the same site, or by the acquirement of land .centrally located and the erection of such buildings thereon. The new ehurch shall decide which coiu-se shall be taken under the provisions of this section.
“ (6) If it be decided to acquire a new site, then the proceeds from the sale or lease of the First and Second Churches--shall be used to pay the present debts of the First Church, and such of the residue of the proceeds shall be used to remodel, rebuild -or build, as provided for in-Article Y, as may be necessary for that purpose, the balance to be invested as an endowment fund.
“ (7) Memorial tablets- of the churches so united, and all memorial tablets now in either ehurch, shall be placed conspicuously in the church edifice occupied by the new church.
“All stationery shall bear the name of the new church, together with the names of the churches so united. These provisions shall apply in the ease of each church hereafter admitted to the union.
“All of which is respectfully submitted, May 23d, 1906.
“First Presbyterian Church — Charles- Weber, J. IT. Leiding, A. D. Birchard.
“Second Presbyterian Church — Stewart Shillito, Wm. ITubbell Fisher, Allen Collier.
“Cincinnati, May 23, 1906.
“We, the undersigned members of the respective boards of trustees, elders and deacons of ‘the First Presbyterian Society in Cincinnati’ and of ‘the Second Presbyterian Church and Society in Cincinnati,’ both incorporated -by laws of Ohio, having at a joint meeting duly adopted the foregoing report, do hereby agree to the union of said two churches upon the terms -and conditions therein stated, and agree to submit at the earliest possi *537 ble date the same -and this agreement to- the separate action of each church at a meeting to be duly called.
“First Presbyterian Church — Charles Weber, George E. Morrell, Wiliam Henry Falls, A. D. Birchard, Jno. D. McLeod.
‘ ‘ Second Presbyterian Church — Stewart ShiUiito, Wm. Hubbell Fisher, Chas. E. Everett, J. Ambrose Johnston, Benj. F. Miller, Wm. J. Breed, Allen Collier, William B. Jones, Elliott H. Pendleton, IT. L. Crane, Charles P. Taft.
“Proxies or Consents. — The undersigned hereby agree to the union of the First and Second Presbyterian Churches- of Cincinnati upon the terms and conditions above set forth, and we do hereby request that in case of our absence from any meeting of our church acting upon said agreement, that our respective votes be cast for ratification thereof by any member of the board of trustees, or of the elders, or of the deacons of our church, who may be present at said meeting. ’ ’
After a disinterested study of the Plan of Union and the Preliminary Agreement, and of the action of the parties thereto, I find myself utterly unable to conclude that by taking the above steps (considering, too, the subsequent voting thereon), these parties either contemplated or requested a purely ecclesiastical union of the First Presbyterian, the Second Presbyterian and Central Churches — such as Presbytery, in fact, instituted.
These were civil corporations under the law of Ohio, and while the spiritual bodies may have owed ecclesiastical submission to Presbytery, there was required by the law of Ohio submission by the corporate entities to its provisions, as well.
All parties recognized that, in the preparation and signing of the same, as becomes immediately apparent on comparison of the Plan and Preliminary Agreement with the statutes of Ohio, relative to the consolidation of -religious corporations (Sections 3777, 3778, 3779), and while these parties to said Plan and Agreement desired the recognition of Presbytery, and desired to have Presbytery effectuate the Union, as contemplated, so as to carry out their allegiance to the church, and so as to continue to enjoy as theretofore whatever benefits might flow therefrom, nevertheless they also desired'to proceed according to express statutory requirements — and they agreed u-pon corporate union, as well 'as purely ecclesiastical union.
*538 ITow could secular trustees of a corporation created under the laws of a state, just by way of example, be merged out of corporate .office by a purely ecclesiastical decree, or by force of it?
The statutes, however, expressly provide for a consolidation of such organizations, and doubtless, mindful of such provisions, as well as for other reasons apparent in the Plan of Union, corporate union according to the law of the state was agreed upon. It was a condition and term of the Agreement, as much as any relating to ecclesiastical union. Moreover, Presbytery itself found that corporate union was intended when it adopted the report of the sub-committee of Presbytery, to which, when the proceedings first came before the Presbytery, the entire proceedings were referred. (See rule 9 Standing Rules of Presbytery, Exhibit F.)
On this committee sat three lawyers, Mr. Frank R. Morse, Judge Aaron McNeill, vice Judge James B. Swing, resigned (who sat for one session), and Mr. Reuben Tyler, one of the able counsel for defendant here.
“It must be remembered” said the committee, “that the plan adopted in the report of the sub-committee of the First and Second Presbyterian Churches Contemplated the Formation op a New Corporate Organization and the transfer by legal and proper means and in accordance with the statutes of Ohio, and the laws of the church to This New Organization, of all the real estate and other property owned and held in trust by each of the churches which were parties to the agreement, and of such other churches as should thereafter be admitted to the union. ’ ’
Said committee likewise reported (inter alia):
“We do not believe that this Presbytery is ready to attempt to exercise the power of eminent domain over the churches under its control, and to parcel out their assets irrespective of the wishes of the separate congregations. We doubt if the Presbytery has any such power irrespective of the wishes of the separate congregations. The property of the First Church is controlled by the members of that church, and the title to this property is vested in its corporate organization, and we believe the civil law of the state will safe-guard their rights, at least to the extent of requiring that the will of the majority be consulted in any proposed alienation of its property.”
It will be observed, too, that the parties acted in their corporate capacities. Corporate meetings were held; indeed the Second *539 Presbyterian Church seems to have voted as a corporation, and even the Central Church (which was not a party to the'Plan and the Preliminary Agreement, and legally could not have been at that time, as we shall presently see), voted on the proposition also, as a corporation.
Moreover, it was subsequently found that the “Proxies that had been used at the corporate meeting of the First Society were prohibited under its charter. And acting on the recommendation of the sub-committee which had investigated that matter, Presbytery sought to secure the legal consent of the corporate body (which held the title as contradistinguished now from the spiritual body), to this merger. ’ ’
Was not this a recognition also of what seemed to be the well-understood intent and agreement of the parties, at that time, that the union that Presbytery was to be asked to effectuate spiritually, and by placing its name on the Presbytenial roll, was a corporate as well as spiritual union of the First and Second Churches, according to the Plan and Preliminary Agreement ?
Now, at the June 27, 1906, meeting of the First Presbyterian Congregation and Society, the right to use the so-called “Proxies” was challenged.
These proxies had been printed as part of the “Agreement” (supra) and on the same sheet and, it will be observed, referred to it. The moderator, who had been previously appointed to preside over this meeting, having anticipated a question on this very matter, came to the meeting with a carefully prepared suggestion, by which, in substance, it was proposed to keep the votes separate, and hand the question of validity of proxies to Presbytery; said moderator stating that it was not a parliamentary question within the province of the moderator to decide.
Plaintiff claims this matter necessitated a ruling, and that there was no ruling, although it was afterwards discovered that the minutes, which had been sent to Presbytery, showed to the contrary. Plaintiff assails the correctness of such minutes (Exhibit Q), and now charges that they have been mutilated, and considerable bitterness has been injected into an already ‘ unfortunate situation. But whatever said minute book may contain, plaintiff further insists that they did not authorize Presbytery to count the proxy votes in any event.
*540 Now, the most casual inspection of the minutes discloses that as to that portion complained of, there has been erasure and re-writting. And if we are to be governed by the .preponderance of the evidence and the circumstances, it is -most unlikely that any “unanimous consent” had been obtained at that meeting. But whether this .alteration was occasioned by pure accident, or by design, by some one hostile to the interests of these people, it seems immaterial, because Presbytery was not authorized to count these votes, and indeed the Congregation could not, legally, be bound by them even if counted, for the reason that there were no rules in the congregation authorizing or permitting proxy votes or votes of that character, and at a meeting, called for the purpose for which this meeting was called, the rules could not be changed. (Pres. Dig., 226-27.)
Furthermore, such votes were clearly illegal under a later resolution of Presbytery, which enactment, while subsequent it is true, is nevertheless only declarative of the law, for such only seems to foe the power of Presbytery, and indeed, the General Assembly itself — the highest judicatory of the church — in its decision dismissing the complaint to Synod, thus indirectly, at least, affirming Presbytery, refrains from passing upon “the regularity” of the proxies, but bases its opinion rather on “estoppel,” and “ratification.” (See decision of General Assembly attached to answer and cross-petition.)
But certainly under the facts as they have developed in this full and extended hearing, there is no room for either doctrine. Surely not by reason of the subsequent resolution to certify the proceedings to Presbytery, and the viva voce vote thereon, because the union that was contemplated, and which was voted on that night, was a two-church union, according to the Plan and Preliminary Agreement. That was the only plan or proposition that was before the people of the First Church, and no other. The provision, with reference to .other churches (Section 7, Plan of Union) is plain and without ambiguity. It had reference to other churches that might desire to come into the union after the union of the two churches had bejen consummated and effected. This language is susceptible of no other construction. There were material reasons why such should *541 have been the purpose of the original parties to the plan, as becomes evident on reading the plan. Morever, this was also the opinion of the Morse committee, and Presbytery itself so found. (September 18, 1906.)
But the positive requirements of the statutes were not satisfied, in that so far as the corporation was concerned, it necessitated a two-third vote.
When Presbytery re-submitted the matter of union to the corporation, the corporation voted it down by decisive majority.
At the congregation or church meeting, by the votes of those present, the merger was lost. It obtained a majority only if the proxies are counted.
But we have seen these proxies were illegal — contrary to the rules of this body and of the Presbyterian organization. Furthermore, neither the terms nor the legal import of these proxies could legally be varied. Consequently they could not legally be counted in favor of a three-church ecclesiastical union in any event, because according to the express terms they were nothing more nor less -than ratifications or agreements' to ratify the two-church merger according to the agreement printed on the same sheet, and to which agreement, by their express and positive terms, they refer. It thus appears that as a matter oe fact, the agreement to merge was never consummated, because the requirements of the statutes were not met, and it .also appears as a fact that the people who composed the First Congregation never requested an ecclesiastical union with the Central and Second Presbyterian Churches.
When the requisite vote was not forthcoming, Presbytery nevertheless, on February 25, 1907, finally declared said three churches merged into one body, the Presbyterian Church of the Covenant, and in this resolution it states that it does this notwithstanding plaintiff voted against the union, and it states that Presbytery believes “it is desirable and expedient to consummate said union, ’ ’ and it likewise finds that the new organization is entitled to all the assets of the former constituent churches— thus property valued at several hundred thousand dollars (report of Morse committee) is disposed of.
In view of the foregoing it is apparent that, in consummating this union, Presbytery acted under the erroneous belief that it *542 had power (no doubt Presbytery was actuated by the sincerest and most conscientious motives) to effect this Three-Church Union, a mistake superinduced by another mistake in recommendation 1, Morse Committee report, September 18, 1906.

The First Church at no time voted to consolidate with the Second and Central Churches as said Committee assumed.

Presbytery made the mistake of believing that by thus consummating the union, it had power to transfer or to cause to be transferred the title of plaintiff’s property without plaintiff’s consent, or without the request or the consent of the people who composed the First Presbyterian Congregation, and to strangers and to new and different uses.
The judicatory of the church therefore having acted, the question now arises, is the finding of the ecclesiastical court binding on this court ? To what extent may this civil court inquire, if at all, into the ecclesiastical decree? If this court must accept as final and binding such ecclesiastical finding as defendant contends, then notwithstanding the fact that civil property rights are involved, this court is “but the clerk and sheriff of the ecclesiastical court to register the decrees of the ecclesiastical court and to hand over the property to one or the other of the contestants in accordance therewith; such construction puts the civil court in an attitude of declining to consider the terms of the contract u,pon which the rights of the contending parties are based, and to ivhich both appeal.”
Indeed,. it means that the court not only may not consider whether such action is contrary to the express terms of that contract, or the law of the organization, but is likewise precluded from determining whether it is contrary to the law of the land.
Before pursuing this question further, it becomes convenient to consider plaintiff’s title. The evidence shows that the property now in actual possession of this plaintiff, and involved in this controversy, was purchased -in 1797 from John Cleves Symmes for a valuable consideration. The Presbyterian congregation was at that time an unincorporated body, and the deed was made to seven trustees (including David E. Wade and James Lyon), for the use, benefit and behoof of the Presbyterian Congregation of Cincinnati. The use of the word “ congregation” would *543 scarcely justify a presumption that this was a trust for the spiritual body exclusively, or for the particular principles of the denomination exclusively — for the benefit of the spiritual body, because under Presbyterian law a congregation may be composed of communicants as well as non-communicants, “those going to school,” who, while they may contribute to the support of the church, are not members of the church in the strict ecclesiastical sense. The congregation in question is the one afterwards known as the First Presbyterian Congregation.
In 1807 plaintiff was incorporated under the laws of Ohio, and by its charter and amendments, the uses to which this very property over which, from that date to this, it has exercised absolute ownership and dominion, are specified. These uses have been and are adverse to the claim now- and at this very late day asserted by defendant. By its charter plaintiff holds this property at its disposal, for the benefit of its members, to defray expenses incident to their mode of worship, of enclosing and keeping in repair their grave-yards or other lots and buildings thereon, and by affording such relief to the poor as their funds may from time to time allow; and these uses are amplified by subsequent amendments. Yet in the face of this character of use, certainly adverse to the pretended rights of the spiritual body, as now asserted on its behalf by its alleged successor, not a single member of the church (communicant), nor the spiritual body, has ever'protested in all these years.
Moreover in Williams v. First Presbyterian Society, 1 O. S., 479, there was a decision by our Supreme Court likewise adverse to any such right as is now asserted. In that case, this very Synunes deed was before the court for construction. The heirs of Williams, it will be noted, contended that the trust declared in this Symmes deed was void for uncertainty as to beneficiaries.
Said the the court, Thurman, J.:
“We are therefore clear that the trust in question is not void for uncertainty as to beneficiaries. The trustees were capable of taking, and it is admitted they took a life estate at least, and the beneficiaries were easily to be ascertained. And when the latter were afterwards incorporated, the corporation became the beneficiary.
*544 “And whether the legal title had gone to the heirs of the trust orto the heirs of Symmes, it remains subject to the trust.”
Notwithstanding this decision, so far as the evidence shows, neither the spiritual body nor any communicant has ever objeeted'to the plaintiff disposing of the property for the benefit of its. members, and in accordance with its charter and amendments.
Although Wade .and Symmes (probably the surviving trustees) each in turn quit-claimed of record, to the use of the Society (see deeds of record herein), not an individual has ever objected, ■and considering the uses specified in the charter and amendments, surely the placing of this property iby the trustees in the hands of the corporation and at its disposal, for the uses specified in the charter and amendments, was putting this property to a use adverse to any such right as is now lately asserted. Whether we consider, then, that the original beneficiary, the Presbyterian Congregation, including communicants and non-communicants, whose use of the property had not been limited or restricted, became incorporated and expressed in the charter and amendments, the manner in which .it would use and consume the property as it had a legal right to do, or whether we consider that the communicants, as distinguished from the non-communicants, even if they had some exclusive rights, relinquished same to the corporation at the time of the incorporation (see language of court in Robertson v. Bullions, 11 N. Y., 264-6-8), and that they confirmed such relinquishment at the time Wade and Lyons quit-claimed, and every time thereafter that the Society exercised acts of ownership adverse to any such right as is now .asserted, the result would still be the same, namely, that the spiritual body can not be considered as the beneficiary of this property and in the manner, and for the use as defendant claims, but tliafi the disposal of its property is in plaintiff for the benefit of its members, and for the uses specified in its charter and amendments.
Inasmuch, therefore, as this plaintiff has certain property rights in this property, inasmuch as the property is not vested in the church, for the particular principles of the denomination solely, and it being conceded in argument (indeed it could not well denied) that the action of the judicatory was purely legis *545 lative and non-judicial, we may now approach for consideration the question of the force and effect of the ecclesiastical decree in the cases such as Watson v. Jones and kindred cases which defendant malíes the predicate of its defense, and its prayer for affirmative relief.
Watson v. Jones.
This ease, as remarked by Neil, J., in Landrith v. Hudgins, 120 S. W. R., 783, has been "oft-quoted and frequently misunderstood. ’ ’
Certainly among the various courts of the country there has been diversity of opinion in regard to it. It involves' a mass of complicated facts and "questions of instrinsic and far-reaching influence.” (Mr. Justice Miller.)
So far as material to this case, attention to the facts will show that in Watson v. Jones the General Assembly had exercised a power amply conferred, to decide all questions respecting doctrine and discipline, and of reproving, warning and hearing testimony 'against error in doctrine or immorality in practice.
The Presbytery of Louisville (subject to whose jurisdiction was the Louisville church), had resolved against the action of the General Assembly, which declared against slavery on moral grounds, and it declared that every Presbytery which refused to obey its order should be ipso facto dissolved. The Louisville church thereupon divided, one part acting under the General Assembly of the United States, and the other under the General Assembly of the Presbyterian Church of the Confederate states. The property of the church was in the trustees who, under statutory law, held the property in trust for the benefit of the church. No question as to the property rights, such as are here involved, were raised. Ownership in the church was conceded. There was no attempt to transfer the property of the Louisville church by a purely legislative act to strangers, nor to divert it to new uses. A question of discipline to which the congregation by its original "convention” had agreed to submit, was regularly determined by the body in whom such power was lawfully vested, by consent of the church, and when this question was- determined, and the ecclesiastical fact established as to who had obeyed the law of the church and its rules with reference to morality — in *546 other words, when it was determined who were the true Presbyterians according to the church standards — that was a decision, which the Supreme Court held, was not to be interfered with. It was a question of discipline, or faith or church government or law, decided by the highest church judicatory. It was a judicial decision by the judicatory of the church upon a question of discipline. Those who submitted to the standards of the church were identified as the true owners of the property of that church, whose property it was; while those who did not submit, who, in other words, were not Presbyterians, were simply told, in effect, that they were not members according to the .established standards of the church (which owned the property) ; in short, they were held to have forfeited their rights to membership in such church and church property.

Manifestly that is not this case.

In Boyles v. Roberts, 121 S. W. Rep., 105, a number of the cases relied on by defendants are clearly, and, as I think, correctly analyzed.
Of Mack v. Kime, supra, the court say:
“The court does not discuss the distinction between cases wherein property rights' are involved, but bases its opinion upon Fussell v. Hail, 233 Ill., 73, wherein the Supreme Court of Illinois afterwards said no property rights were involved.”
The court then proceeds to criticize Wallace v. Hughes, supra, decided by a divided court, Settle, C. J., not sitting, and Nunn, J., dissenting.
But that case, like the United Brethren eases, and the Cumberland merger cases, are clearly distinguishable from the case at bar, along lines already set out. As are likewise cases where there has been a split in the congregations and the property has been divided between the respective divisions with their consent.
Nor will Brundage v. Deardorf, 92 Fed., 214, support the contention of defendant,"because that case, too, was a ease of- forfeiture of membership in the church, and the church had acquired the property for religious uses with no other limitation.
Of Brown v. Clark, 116 S. W., 360, the court in Boyle v. Roberts say that Fussell v. Hail, Mack v. Kime, Wallace v. Hughes and *547 Watson v. Jones are followed and relied upon, and calls attention to the fact that no other case is cited.
For thoroughness of research the decision in Clark v. Brown, which was reversed by the court thus criticized (see 108 S. W., 421), is commended .as much the better of the two opinions.
Now, cases where a purely ecclesiastical question of doctrine, discipline, or faith or church government or law have been judicially determined, with opportunity to be heard, and where there has been' no fraud or collusion or other violation of the cardinal principles of justice, are clearly distinguishable, in my opinion, from the line of cases which are applicable and controlling here, where the act complained of was a legislative or nonjudicial act, and where civil property rights (always within the protection of the civil courts) are involved.
In this class of eases it becomes obligatory on the civil courts, no matter how difficult the question may be, to investigate the regularity of the proceedings of the church judicatory and determine whether it had acted within, the constitutional grant of power. If those acts are beyond the constitutional grant of power, or if they are in conflict with the laws of the land, they are void.
In Landrith v. Hudgins, supra, the court say:
"The question has been discussed in the briefs as to whether the ecclesiastical eoiu'ts, in making the- determinations referred to, were acting in a judicial or legislative capacity; these bodies, under the ecclesiastical system which we are examining, possessing both of these powers and also executive powers. We think it immaterial whether the power exercised was legislative or judicial, though of course it was the former, as no case or controversy between parties was on trial. The question simply is whether the determination of an ecclesiastical question by an ecclesiastical body is binding upon a civil court administering the law of the land, in disposing of property rights, when the correct view of the nature, means, extent, and hearing of such ecclesiastical question is necessary to be determined in order to settle property rights. Another aspect of the same question is whether the civil court has power to determine whether a particular ecclesiastical body, within the general organization and jurisdiction, under the Constitution or constituent contract of the ecclesiastical organization, to pass upon the particular question.
"If neiher the question to be decided in a given case (the ececclesiastical question) nor the power (jurisdiction) of the ecclesiastical court that decided it is open to examination in the civil *548 court then there is nothing in any case for the civil court to do except to register the decree of the ecclesiastical court, and hand over the property to one or the other of the contestants in accordance therewith. This makes the civil court but the clerk and sheriff of the ecclesiastical court. Such construction puts the civil court in the attitude of declining to consider the terms of the contract on which the rights of the contending parties are based, and to which both appeal.
“The civil courts have no power, under the constitutions by which they exist, in this country to intermeddle with religious matters purely as such, or to assume to settle for the contending parties in churches any question of doctrine, discipline or organization. These are things, wholly apart and aside from the paths to which civil courts are accustomed, and the fields in which they are wont to work.
“But when church organizations buy and take title to property, then they enter the domain wherein civil courts control. In case any question arise between contending parties or individuals, as to such property, the title, right of possession, or use, that question must be decided by the civil court.
“It must be decided like any other question, according to the contract on which the right is based. * * #
“The civil court, in deciding a property right, should honor the deliverances of the ecclesiastical court with the greatest attention and respect, but should not follow it unquestioningly in every case. If the civil court can see clearly and satisfactorily that the ecclesiastical court was in error, then it should say so, and adjudge accordingly. It can do no less in view of its obligations to do justice between the parties. It can not, in discharging its duty, decide on questions of property, hand over its conscience to the beeping of any church organization. The civil courts can not rightly evade the labor of investigating the questions that arise in such controversy, no matter how difficult or unfamiliar the questions may be, nor can it escape the responsibility, no matter how .embarrassing. It is proper that the civil court should act with diffidence, it is true, on such questions, yielding all respect due to the opinions of experts, as upon any subject on which expert evidence is required, but when it clearly appears that the ecclesiastical tribunal is wrong, it should not be followed. If the civil court look wholly to the ecclesiastical courts for the settlement of the principle, or as the case may be, the facts, on .which the right of property turns, then the former court abdicates its function in favor of the latter. The civil court can not invade the sacred enclosure of the church, and assume to direct her teachings, or the administration of her rights and ceremonies, or to hinder the imposition of her censures, but where property rights are involved, the church as to these *549 stands on the same plane with all other persons, natural and corporate, no higher, no lower. The law is over all. ’ ’
In Boyles v. Roberts, supra, the court quotes approvingly the language of the Court of Appeals in Watson v. Avery, 2 Bush (Ky.), 332, and the court say:
“And in the investigation of property rights the civil courts will investigate and see that the church judicatory has acted, and, if so, whether it has acted within the terms of the constitutional grant of power. If beyond the constitutional provisions of the church, the acts will be declared void.” (Citing authorities.)
‘ ‘ Speaking to the contention that the action of the church judi-' catories of the Presbyterian Church could not even be questioned upon the ground that the action was unconstitutional,' and that such bodies were judges of their own jurisdiction, the Court of Appeals of Kentucky, in the Watson case, s^ipra, says: ‘Such a construction of the powers of church tribunals would, in our opinion, subject all individuals and property rights confided or dedicated to the use of religious organizations, to the arbitrary will of those who may constitute their judicatories and representative bodies, without regard to any of the regulations or constitutional restraints, by which, according to the principles and objects of such organizations, it was intended that said individual and property rights should be protected. Especially is this so with reference to the powers of the higher courts of the Presbyterian Church. Those powers are not only defined, but limited by the Constitution. But if it be .true, as insisted for the appellees, that the inferior courts and people of the church are bound to accept as final and conclusive the Assembly’s own construction of its powers, and submit to its edicts as obligatory, without inquiring whether they transcend the barriers of the Constitution or not, the will of the Assembly, and not the Constitution, becomes the fundamental law of the church. But the Constitution, having been adopted as the supreme law of the church, must be supreme alike over the Assembly and people. If it is not, and only binding on the latter, the supreme judicatory is at once a government of despotism and unlimited powers. But we hold that the Assembly, like other courts, is limited in its authority by the law under which it acts; and when rights of property, which are secured to congregations and individuals, by the organic law of the church, are violated by unconstitutional acts of the higher courts, the parties thus aggrieved are entitled to rélief in the civil courts as in ordinary eases of injury resulting from a violation of a contract, or the fundamental law of a voluntary association.’ ”
*550 See, also, Exhibit K-l, Minutes General Assembly, 1909. And in Brundage v. Deardorf, decision on demurrer, Judge Taft held:
‘ ‘ Even if the supreme judicatory has the right to construe the limitation of its own power, and the civil court can not interfere with such construction, and take it as conclusive, we do not understand the Supreme Court in Watson v. Jones to hold that an open and avowed defiance of the original contract and express violation of it will be taken as a decision of the supreme judicatory which is binding on the civil court. Certainly the effect of Watson v. Jones can not extend beyond the principle that a bona fide decision of the fundamental law of the church must be recognized by civil courts. ’ ’
In Harrison v. Hoyle, 24 O. S., 286, it was said:
“When public policy, or positive law of the land, is not contravened, the decisions and orders of the society when made in conformity to its polity, should have the same effect upon the subject to which they relate, in civil courts, which the society intended should be awarded to them when pronounced by its own judicatory. ’ ’
In Krecker v. Shirey, 163 Pa. St., 534, it was held:
“Upon the questions arising under the discipline as upon Lhose arising under articles of faith, the decisions of the ecclesiastical body are ordinarily final and they will be respected and enforced by the courts of law, but if such decisions plainly violate the law they profess to administer .or are in conflict with the laws of the land, they will not be followed. ’ ’
In Bartholomew v. The Lutheran Congregation, 35 O. S., 567, 574, the Evangelican-Lutheran church at Lima voted to withdraw and so notified Synod. Synod promptly suspended Rev. Bartholomew, and the committee appointed by Synod recommended that those who complained to Synod of such action urge Bartholomew faction to return, and if it did not do so, that complainants be recognized as the congregation. Complainants attempted to carry out this order of Synod by removing several of the trustees and electing other trustees, and they took possession of the property and sued to enjoin Bartholomew and the old trustees from interfering.
Our Supreme Court, notwithstanding the decision of the judicatory, considered the rights of the congregation under the constitution and the rules of the congregation. It reviewed the proceed *551 ings of the Synod of Ohio, and found them void for want of jurisdiction, and the court said:
“The power to withdraw clearly existed, according to a fair construction of the constitution and rules of the congregation, and the governing bodies; the pendency of the appeals and complaints in the Synod — assuming that they were then- pending — could not affect the right to exercise such power; nor was the withdrawal in any way affected by the subsequent appearance of Rev. A. S. Bartholomew before the Synod to present his protest against its action. It follows, therefore, that the action of the district Synod of Ohio, on December 23, 1873, so far as it related to the Lima congregation, and the proceedings at the meeting held in Lima, Janu-ary 10, 1874, were simply void. ’ ’
And so in a proper merger case, the power to unite under the constitution or form of government is given if a request is properly made, but if no such request is made, the act of the judica-’ tory is void for want of jurisdiction. That courts will investigate the regularity and constitutionality of the acts of church bodies where civil property rights are involved, see also:
McAuley’s App., 77 Pa. St., 398; Wallace v. Trustees, 194 Pa. St., 178; Hatfield v. Delong, 156 Ind., 207; Kerrs App., 89 Pa. St., 97; Thompson v. Cath. Cong. Society, 5 Pick. (Mass.), 469; Same v. same, 7 Pick., 160; Bird v. St. Marks Church, 67 Ia., 567; Philomath College v. Wyatt, 27 Oregon, 370; Everett v. First Presbyterian Church, 53 N. J. L., 500; Jennings v. Scarborough, 56 N. J. L., 401; McFaddin v. Murphy, 149 Mass., 341; Ramsey v. Hicks, 87 N. E., 1091; Fussell v. Hail, 233 Ill., 73.
Returning now to the action of Presbytery, it will be noted that by virtue of Chapter 10, Section 7 of the Form of Government, the Presbytery has the power:
“To unite or divide congregations at the request of the people, or to form or receive new congregations, and in general to. order whatever pertains to the spiritual welfare of. the churches under their care.” [Italics mine.]
Now it will be observed that this section confers a power and that this power is at once limited and defined. Certainly the latter part of this section would not justify Presbytery (as argued by defendants’ counsel and in brief) in attempting to unite the churches upon its own initiative without the consent of the peo *552 pie. If it did malte such attempt, because of some belief entertained by it, that it was desirable or expedient so to do (see language of merger), no matter how sincere and well grounded such belief may have been, in the absence of a valid and proper request of the people for union,- such union could not stand. Endlich on Interpretation of Statutes, Par. 398, 399, 216, note 26, 443.
The power to unite churches can only attach when a request is forthcoming and at the request of the people. 31 Enc. of Proc., p. 1235.
If a request had been made by the First Presbyterian Congregation and upon which Presbytery acted, such request must be found in the written proceedings which the Congregation and Presbytery had before them, and, as stated, these proceedings are not susceptible of .any such construction. And even if, as the defendant claims the “piety,” “learning” and “sound sense” of the meeting may be taken into consideration by Presbytery in determining whether or not a “request” had been made, I am at a loss to understand by what magic the sound sense of the meeting can be construed in favor of a proposition totally different from the one which was before it. For the same reason I fail to understand how the resolution to certify the proceedings to Presbytery could amount in legal effect to ratification. (See decision of 'General Assembly.)
If there is any inherent power in Presbytery to determine who constitutes “the people” (the Constitution being silent on that point) whose union it will effectuate, or to whose request for union it will give ecclesiastical sanction, by placing its united church on the rolls, thus permitting it to participate in the benefits of the organization, certainly there can be no implied power to declare that a request was made, when as a matter of fact it affirmatively appears that none was made, because -the Constitution expressly prescribes that there must be a “ request. ’ ’ No one could be bound by Presbytery adjudging that it had jurisdiction, if it affirmatively appeared it did not have. Presbyterial judgment on that question could not be final. Boyles v. Roberts (supra).
Under the authorities the existence of the “request” becomes vital. The Constitution, which is nothing more nor less than a contract (all the authorities so declare), expressly provides that *553 the people may request a union, and that thereupon Presbytery may unite.
If the pople request one thing and another be given, can it be said that there was a request for the thing given? Manifestly not. This provision, then, confers at once a power and a right, but the existence or non-existence of the request goes to the very jurisdiction of Presbytery to exercise the power. It is a condition precedent to the exercise of the power. (See 31 Enc. of Proc., 1073.) And until a congregation requests to go into a union it is its right to stay out.
In Everett v. First Presbyterian Church, 53 N. J., 500, the court said:
‘ ‘ Presbyteries have power of visitation over churches, but it is wholly spiritual and advisory, and they have .also the power to unite or divide congregations, at the request of the people, and to form and receive now congregations; but they can not divide a congregation against its will, nor unite two against their will.
‘ ‘ The action in this regard is purely one of assistance and recognition, and is wholly spiritual. ’ ’
The request then being a condition precedent to the exercise of the power, it must be strictly complied with. 31 Enc. Proc., 1132-33; McGehee on Due Process, pp. 87-88; 135 Mass., 482.
Th order made by Presbytery being a legislative order, and since it affirmatively appears from the proceedings that there was no request for union, nor even if the “proxies” are to be counted, that there was a request for a union, such as was instituted by Presbytery, the act of Presbytery in attempting to unite this First Presbyterian Congregation with the two other churches was violative of the organic law of the church and of the rights of the people who composed the First Presbyterian Congregation.
The Presbytery was without power in the premises, because the jurisdictional facts are shown to have been utterly lacking. Anderson v. Commissioners, 12 O. S., 635; Joyce v. Barron, 67 O. S., 264; Hettleston v. Hendricks, 52 O. S., 460; Stevens v. Daniel, 27 O. S., 528.
And even if it be considered that Synod and the General Assembly, in dismissing -the complaints, thereby affirmed the decree of Presbytery, no additional force or effect may be imputed *554 thereby to the act of Presbytery, because a judgment lacking jurisdictional facts is equally void whether rendered by the highest of lowest court. Van Fleet, Collateral Attack, Section 16; Chambers v. Hodges, 23 Texas, 104; Wilson v. Montgomery, 22 Miss., 205, 207.
Therefore the merger resolution was void, so far as this plaintiff was concerned.
That the action of Presbytery was .purely non-judicial is evident by numerous provisions in the Book of Discipline. (See Sections 16, 21, 27, 29, 24, 94, 11.)
As I have said, that was conceded in argument. It is therefore manifest that there was no judicial trial of the questions involved with the right to be heard and to defend.
It would be no answer to say that a legislative act sometimes partakes of judicial attributes.
There was no right to be heard or to defend. Moreover, according to church law itself, questions affecting title to property must be decided by the courts of the state. Moore’s Dig. (1886), page 172; Dr. Swiggett’s testimony, pages 66, 67, 82, 83, 86, 88, 89; Presbyterian Dig., p. 215.
Suppose such were not the rule. If Presbytery had the power claimed for it, it inevitably results that by legislative act merely, it can transfer property of a subordinate church without its consent or without any right to be heard. It therefore could annex a civil penalty by way of forfeiture for refusal to obey a legislative order, a thing at once abhorrent to the law of the church, as well as to the law of the land. Cooley Const. Lim., 7th Ed., 518; Confession of Faith, Chap. 31, par. 4; Presbyterian Dig.; 154, 316; Chap. 8, Sec. 2, Form of Government.
Furthermore, Section 16 of the Bill of Rights of the Ohio Constitution prohibits the transfer of one person’s property to another without the owner’s consent, except by due course of law, and the Federal Constitution (Amendment XIV) prohibits any state from making or enforcing any law that shall deprive any person of life, liberty or property without due process of law, all of which, in a case where rights of property are involved, renders imperative a judicial proceeding before a court of competent jurisdiction, with the right to be heard and to defend.
*555 If we were to assume that these judicatories have power to ti y the questions, neither the plaintiff nor the people who compose the congregation had any legal right or opportunity to be heard or to defend.
The delegate from Session does not meet the requirement, because as I understand it, the spiritual body only selects Session, which, in turn, selects the delegates.
Under the Form of Government, there is no provision for representation of the plaintiff or the congregation, in either of the judicatories, and therefore in the trial of the question involving its property, there is no legal right to be heard, to defend or to appeal. 'All of which may be explanatory of the fact foreshadowed early in this opinion, that there was no appeal or complaint to Synod, or to the General Assembly by this plaintiff or the people whose property was thus involved.
It is no answer to say that the plaintiff’s complaint is against the Presbyterian system, to which, by the ‘ ‘ convention, ’ ’ its people had agreed to abide. Its complaint is, that its fundamental rights under the law of the land have been violated, as well as that the organic law of the church has not been observed. Nor is it any answer to say that due course of law and due process of law are being observed, because the parties are now in this court to adjudicate the question. Such proposition is certainly at variance with the erstwhile claim that this court is bound by the ecclesiastical decree. That decree, according to defendant, practically settles this dispute and this court is simply asked to hand over the property to the defendant on the basis of and in accordance with that decree.
It is also claimed by plaintiff, and I think rightly, under the authorities, that questions of title can not be taken from the civil courts by contract nor that any person by contract can be compelled to submit a question of title to a church judicatory.
It suffices to state that whatever may have been the contract here, it contemplated consent by a proper and valid request. There was no such consent, because there was no request, and no request for the three-church ecclesiastical union was ever made. •
The union that was consummated was entirely foreign to the union that the people of the First Congregation and this plaintiff either contemplated or voted upon.
*556 According to the Plan and Agreement, the statutory law of Ohio, as well as the church law, was in contemplation. Indeed, not only by act of the parties, but by force of the positive provisons of the law itself, the statutory provisions had to be complied with. The attempt to dispense with them in the method of merging there civil institutions was violative of that law, as well as of the church.
Speaking of a resolution of the General Assembly (Presbyterian Digest, 880), to that effect, Wagner in his book entitled “Relations of Sessions and Trustees,” published by the Presbyterian Board of Publication (1906), says:
“Doubtless without this proviso the civil courts would have ignored the acts of the General Assembly in so far as in any particular jurisdiction it contravened the provisions of the civil law, but I cite this provision to show the recognition by Presbyterian authority of the fact that the law of the state where the church is located and the laws of the United States and the charter (if there be one) are, after all, the paramount authority to which all of us must bow. ’ ’
See, also, Dial on Religious Corporations, 84; Erste Cong. v. Verein, 66 N. Y. Supp., 356; Ashley v. Ryan, 153 U. S., 436; Fadness v. Braunbery, 73 Wis., 257; Calkins v. Cheney, 92 Ill., 463; Davis v. Cong. Beth. Teph Israel, 40 N. Y. App., 424; Wilson v. Livingston, 99 Mich., 594; Robertson v. Bullions, 9 Barb., 64, 67.
To enforce this decree would be to override the statutes, and that this court can not do.
For all these reasons the plaintiff is entitled to the protection of this court with reference to this property, and a decree may be taken in accordance herewith.